UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRETT GOLDBERG,<br><br>            Plaintiff,<br><br>v.<br><br>PACE UNIVERSITY,<br><br>            Defendant. | Civil Action No. 1:20-cv-3665<br><br><br>(JURY TRIAL DEMANDED) |

## SECOND AMENDED COMPLAINT

Plaintiff Brett Goldberg ("Plaintiff") by and through undersigned counsel, hereby complains of Pace University ("Defendant" or "Pace") as follows:

### INTRODUCTION

1.      Plaintiff brings this case as a result of Defendant's decision to substantially reduce the Plaintiff's educational and other benefits, but without any reduction in charges, in conjunction with Defendant's decision to close the campus, and transition all classes to an online/remote format as a result of the Novel Coronavirus Disease ("COVID-19").

2.      While transitioning to online classes was important in view of the current pandemic, this decision deprived Plaintiff from realizing the benefits of the in-person instruction and program he has paid for.  Those benefits included, but are not limited to, allowing Plaintiff to learn in-person and to showcase his play to professional "representatives from the theater, film and television industries"  in the Repertory Season ("Rep-Season,"), the culmination of three years of in-person instruction and collaboration at Pace's "The Actors Studio Drama School," ("The Actors Studio") in exchange for which he had already paid Fees and tuition.

3.      Defendant has admitted that the Rep-Season included "professional productions

of the work students have created during their three years with us [i.e., Pace]."  Exhibit 1, at 1.

4.     Defendant has also advertised that the Rep-Season was "designed to introduce graduating students to the professional world and the public in fully-professional productions of the work they have created during their three years of study."  Exhibit 2, at 1.

5.     The advertised MFA curriculum specifically states that "In the third year, the three groups [i.e., playwrights, actors and directors] apply their knowledge [from the first two years] and work together as an ensemble to create and perform in a professionally produced Repertory Season that is presented to the industry and the public."  Exhibit 3, at 1.

6.     The President of Pace, Marvin Krislov, has stated that the Rep-Season "is the culmination of three years of intense study and preparation—and their introduction to the professional theater world."  Exhibit 4, at 4.

7.     Co-Presidents, Ellen Burstyn, Alec Baldwin, and Al Pacino have stated that the Rep-Season, is a celebration of "three years of dedicated study and hard work that provides a secure foundation for our graduates as they move into the professional world."  *Id.*

8.     Defendant has refused to provide any reimbursement to Plaintiff for benefits that Defendant is no longer providing, and will not provide, during the remaining tenure of Plaintiff in his final year of his Master of Fine Arts program.  (Graduation was scheduled to take place on May 20, 2020 but has since been canceled. The students have heard no further word from Defendant about graduation or receiving their diplomas.)

9.     As such, Plaintiff has been damaged by Defendant's retention of tuition funds for educational services that Defendant charged and collected for, but has not provided, and by Defendant's cancellation of the Rep-Season, which Plaintiff also paid for, but that Defendant has chosen to not provide now or at any time in the future.

10.     Furthermore, Plaintiff has paid substantial amounts over three years to prepare for the Rep-Season, but a significant amount of that preparation is all for naught now that the Rep-Season has been canceled.

11.     This action seeks refunds of the tuition which Plaintiff has paid for the three year program, which was predicated on presentation of a play in the Rep-Season, or at a minimum the refund of a portion of the tuition, which Plaintiff should be reimbursed on a pro-rata basis, along with the value of the Rep-Season, as contract damages or, in the alternative, as unjust enrichment damages, and damages associated with the violation of New York General Business Law § 349, and an Order for Pace to correct its misleading advertising, together with other damages as pled herein.

**PARTIES**

12.     Defendant Pace University is an institution of higher learning located in New York City, New York, and a citizen of the State of New York.

13.     Upon information and belief, Defendant has an estimated endowment of approximately $182 Million. *See,* https://www.pace.edu/sites/default/files/files/finance-administration/financial-treasury-services/financial- statements/financial-statements-2018.pdf.

14.     Upon information and belief, Defendant was eligible to receive federal stimulus funds under the CARES Act. The CARES Act directs that approximately $14 billion dollars be distributed to colleges and universities based upon enrollment and requires that institutions must use at least half of the funds they receive to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to COVID-19.

15.     Upon information and belief, Defendant did receive federal stimulus funds under the CARES Act, but did not distribute any such funds to third year students as a reimbursement

for tuition, Fees, or the value of the Rep-Season.

16.     Plaintiff is an individual citizen of the State of New Jersey.

17.     Plaintiff was enrolled as a full-time student in Defendant's graduate program at The Actors Studio as an aspiring playwright.

18.     Plaintiff has paid a substantial amount of tuition for all three years of the Master of Fine Arts ("MFA") Pace graduate program, including the Spring 2020 semester which was his final semester at Pace.

19.     Defendant offers an in-person, hands-on curriculum.  Plaintiff did not choose to attend another institution of higher learning, or to seek a less expensive online degree, but instead chose to attend Pace and to enroll in-person to take advantage of the promised in-person give and take associated with an MFA graduate program.  To that end, Plaintiff was promised by Pace, *inter alia,* networking and mentorship opportunities, and in-person collaboration with other students and professors, including but not limited to, readings and "workshopping" of his plays and screenplays.  In fact, Pace advertised and promised "faculty and student collaboration spaces," succinctly stating "We're here for YOU – and these new spaces reflect that." *See,* https://www.pace.edu/nyc

20.     Pace's general policy, which include The Actors Studio, required in-person class attendance or it could affect the student's grades.

21.     As an example, the attached syllabus for the Process Lab class indicates that the class is to be held in person.  It states for example that "The entire class is responsible for leaving the room spotless" which only makes sense in the context of in-person classes.  Exhibit 7 at 4 (last bullet point).

22.     Likewise it states that:  "6.  Since emails have proven to be counter-productive,

all issues regarding the project shall be dealt with in the classroom sessions face-to-face and not through email." Exhibit 7 at 3 ¶6.

23.     In other words, the syllabus specifically indicates that the classes are to be held "face-to-face"; and that online experiences are not as effective, or, in fact, "have proven to be counter-productive."

24.     Furthermore, Plaintiff attended a playwriting program at Pace, rather than an online program, since he viewed an in-person program as being more effective. Other programs at Pace were and continue to be offered on-line. *See, e.g.,* Exhibit 9.

25.     Such online programs are less expensive than Pace's in-person programs.

26.     For example, in Pace's MA in Humanities American History Emphasis Program, each 3 credit course is $750 (Exhibit 9 at 7 ("Costs and Financial Aid"). In contrast, The Actors Studio classes are approximately $4,500 for each 3 credit class, or approximately six (6) times as expensive.

27.     The Actors Studio specifically advertises and promises the following to attract aspiring playwrights like Plaintiff under the "Unique Aspects of The Actors Studio Drama School":

> All students – actors, directors, playwrights – **train side-by-side as actors.**
>
> In Friday Workshops ["Process Lab"] the MFA candidates are exposed to different elements of the theater, such as script analysis, design, stage combat, directing, and auditioning for plays, musicals, film and television.
>
> All MFA black-box studios for professional training are designed and equipped according to state-of-the-art standards.
>
> Located at prominent and easily reached campus in downtown New York City.
>
> New York City - the theatre capital of America and the largest media and cultural market in the world - provides Pace students with incomparable resources for the development of their art and the launching of their careers.

*See,* https://www.pace.edu/dyson/departments/actors-studio-drama-school/unique-aspects-actors-studio-drama-school

28.     In addition to tuition, Plaintiff was required to pay (and did pay) certain mandatory fees, including but not limited to the General Fee, Activity Fee, Health Center Fee, and Technology Fee (collectively "Fees") which required Plaintiff to be on campus.

29.     According to Defendant Pace, the Fees are intended to cover "costs associated with ancillary services provided to students which are not covered by tuition". https://pace.smartcatalogiq.com/en/2019-2020/Graduate-Catalog/General-University/Tuition-and-Fees/Special- Course-Fees/

30.     As a result of being restricted from campus, Plaintiff no longer had the benefit of the services for which these Fees have been paid.  For example, Plaintiff no longer had access to libraries, the university healthcare unit, or campus computer labs, and no longer had the ability to participate in student activities.

31.     Moreover, Plaintiff chose the Pace program so that he could have his play professionally produced in New York before, among others, professional agents, literary managers and artistic directors, and the like.

32.     The Rep-Season is the cornerstone of the playwriting curriculum.  It is the selling point of the playwriting track for the students, including Plaintiff.  The entire playwriting program is built around the Rep-Season, beginning with the first-year playwriting class in which the play for the Rep-Season is chosen.  This is followed by other playwriting classes described below, and the "Playwright Directors Unit" (in the second year) where the Rep-Season plays are workshopped the entire second year in an effort to prepare them for the production the following year.  In the third year, students take "Process Lab" where the play is further developed and

honed for the end of the year.  The third year "Playwriting" class also focuses on fine tuning the plays for the Rep-Season.

33.     Simply put, the purpose and culmination of Plaintiff's three years of hard work never came to fruition despite Pace's promises.

34.     Yet, Pace was unjustly enriched by receiving tuition without providing the professional Rep-Season and other classes and services that Plaintiff paid for and was entitled to.

35.     Pace has both refused to provide those benefits at present or in the future and also refused to refund the amounts paid for those benefits.

36.     Pace specifically advertised and promised Plaintiff that its Rep-Season was as follows:

**REPERTORY SEASON AND INDUSTRY SHOWCASE**:

In their final year, all Actors Studio Drama School students present their work to the professional world and the public, in a fully-produced professional Repertory Season at a theater in downtown Manhattan.  *See,* https://www.pace.edu/dyson/departments/actors-studio-drama-school/unique-aspects-actors-studio-drama-school

37.     **Pace also advertises its "Playwriting Opportunities" as follows:**

- Their work is staged by their colleagues in Directing and Acting, in class and for the public.

- In the third year, their best work is presented in a professionally produced Repertory Season for the general public and the theater profession.

- In the last month of their training, their full-length play is professionally presented as a staged reading open to the public.

*See,* https://www.pace.edu/dyson/departments/actors-studio-drama-school/mfa-curriculum.

38.     Simply put, Pace specifically marketed and continues to market the benefits of its on-campus learning experience along with its promise to provide a fully produced professional

play production.

39.     Plaintiff relied on Pace's promises and the benefits it stated it could provide in choosing to attend the program at Pace.

40.     Plaintiff's education has been changed from in-person, hands-on learning to online instruction, which is not comparable.

41.     In some cases, the professors, in contradiction to Pace's promises, simply canceled classes—for example, the Process Lab class ceased to exist after COVID-19 shut down the campus.

42.     To that end, Ken Urso, Director of Professional Development at Pace as of March 25, 2020, stated to the students that "It is our [Pace's] intention that these [5 Process Lab classes] will be more than made up."  Exhibit 5, at 2.

43.     However, they were never made up, breaking Pace's promise.

44.     Pace offered no refunds for these canceled classes.  It simply kept the *pro rata* share of Plaintiff's tuition, Fees, and the value of the Rep-Season.

45.     Moreover, Plaintiff's online instruction during his third year was not commensurate with or comparable to the same classes being taught in person.

## JURISDICTION AND VENUE

46.     This Court has personal jurisdiction over Defendant because Defendant is domiciled in New York and conducts business in New York.

47.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because Defendant is an educational institution domiciled and doing business in this District.

48.     This Court also has subject-matter jurisdiction over this action pursuant to 28

U.S.C. § 1332(a)(1), because this case is a civil action where the matter in controversy exceeds

the sum or value of $75,000, exclusive of interest and costs, and is between citizens or entities of

different States.

49.    To that end, the amount at issue is in this matter is excess of $75,000.

50.    The tuition and associated fees were approximately $45,000 per year during this

three year program.  Plaintiff was given a scholarship which brought the cost down to $30,000

per year.  As such, Plaintiff spent a total of approximately $90,000 on tuition and Fees to attend

The Actors Studio from 2017-2020.  Because the entire three-year program was geared toward

the performance of the Rep Season, as was promised to Plaintiff, as set forth in the Pace Catalog,

its website, statements by the President of Pace University and the Co-Presidents of The Actors

Studio, Plaintiff prays for the return of the entire amount of the approximately $90,000 in tuition

and Fees.

51.    As an alternative to a refund of full tuition, Plaintiff seeks full compensation so

that Plaintiff can produce his play, as was promised to him as part of the Rep-Season, plus the

difference in tuition and fees between what the classes and program that Pace promised and what

Pace provided, the sum of which is well in excess of $75,000.

52.    Plaintiff also seeks that Defendant Pace compensate him for the cost for him to

produce his play, which was promised to him by Pace as part of the contract with Pace.

53.    In the event Plaintiff would have to produce his own play as a result of the

canceled Rep-Season, the amount involved would be at least $75,000.   As can be seen by an

independent article, rents for a week of an off-Broadway theater range from $10,000 to $25,000

per week.[1]

---

[1] https://www.kgmtheatrical.com/blog/how-much-does-an-off-broadway-show-cost-to-

54.     Additionally, the estimate in the article does not include at least the following: costumes, lighting, fees for a director, actors, set designers (lighting, sound, and props), rehearsal space, and payment to the actors and director for rehearsal, advertising, and marketing.  A 2005 New York Times article stated that an off-Broadway play produced in 2003 doing it "the cheapest possible variety with "a cast of two, one set, no musicians.  Still, it will cost, $240,000 to stage . . .. a figure that included approximately $36,000 for sets and costumes, $30,000 for fees and creative staff and $40,000 for publicity."[2]  The price of such a production in 2020 would be higher.

55.     The cost would also include Plaintiff's lost wages during the period that he would have to leave his full-time job to produce his play and present it to the public.

56.     Along with that cost to produce his play, Plaintiff seeks the difference in the amount that was promised to Plaintiff for in person education less the amount for on-line classes, especially in a program that concerns acting, directing and playwriting.  Moreover, Plaintiff seeks a return of the Fees that were not returned by Pace once the program went on-line, those are also included in the Prayer for Relief.   Plaintiff also seeks that Pace compensate Plaintiff for classes that were not held at all (e.g., Process Lab) even though other classes were held online after in-person classes were transitioned to online.

57.     In addition to the above recoveries (return of Plaintiff's full tuition and fees; or the cost for Plaintiff to produce his own play that was supposed to be presented during the Rep-

---

produce#:~:text=One%20of%20the%20first%20things,likely%20not%20more%20than%20%24
3%2C000%2C000.&text=Below%20are%20the%20major%20factors,influence%20your%20Off
%2DBroadway%20budget.

[2] https://www.nytimes.com/2005/02/01/theater/newsandfeatures/off-broadway-success-grows-costly-and
rare.html#:~:text=Long%20considered%20a%20cheaper%2C%20more,some%20costing%20nea
rly%20%241%20million—

Season with a pro-rata return of tuition and fees), Plaintiff seeks his future lost profits

(recognized in New York) for the cancellation of the Rep-Season.

58.     The cancellation of the Rep-Season has damaged Plaintiff by depriving him of

unique opportunities for his career which are valued well in excess of $75,000.

59.     Namely, Plaintiff's play was supposed to be performed during the 2020 Rep-

Season which would have accorded him five (5) audiences of the professional world including

industry agents and publishers.  As result of the cancellation of the Rep-Season, Plaintiff had no

chance to show his play to the professional industry.  This damage was directly caused by the

breach of contract formed through the terms set forth in the Pace catalogue, website, and other

Pace publications, or in the alternative unjust enrichment.

60.     The purpose of the Rep-Season, including the introduction of Plaintiff's play to

the professional industry, was for the purpose of showing Plaintiff's play to publishers and

agents.  It was also to allow him to work alongside seasoned backstage professionals that would

have potentially opened doors in the theater industry.  The loss of those opportunities has

substantially damaged Plaintiff.

61.     In fact, history has shown that playwrights at The Actors Studio have had their

plays professionally produced or published as a result of the Rep-Season, which opportunity has

been lost by Plaintiff.

62.     For example, The Actors Studio MFA playwright Sean Michael Welch premiered

his play ("All an Act") at a previous Rep-Season.[3]  As a result, shortly thereafter it was

professionally produced at the Edinburgh Fringe Festival.

63.     The Actors Studio MFA playwright Estelle Olvia's play (Picket Fence) was

_____

[3]     https://pressroom.blogs.pace.edu/tag/sean-michael-welch/

professionally published as a result of appearing in the Rep-Season.

64.      Data dictates that theater companies pay "thousands of dollars" for a stage play.[4]

65.      This lost opportunity has damaged Plaintiff's career.

66.      In addition, it has negatively impacted the value of Plaintiff's anticipated degree from Pace, below what Plaintiff had bargained and paid for.

## FACTUAL ALLEGATIONS

67.      Plaintiff was accepted to, and enrolled in, a three-year (3) masters program in playwriting at Defendant Pace University.

68.      When Plaintiff applied, it was understood between Plaintiff and Defendant that the program being offered was an in-person program.

69.      When Plaintiff was accepted and when he enrolled, there was a meeting of the minds between Plaintiff and Defendant that Pace would be providing Plaintiff with three (3) years of in-person instruction.

70.      Each and every one of the courses offered by Pace as part of Plaintiff's three-year program were in-person courses.

71.      It is understood in academia that the traditional format of a university is to provide in-person courses.  Online courses have been the exception and are specifically identified as such in advance to students, and to prospective students, to avoid deception.

72.      Pace, for example, offers some online masters programs, and expressly labels them as such.  *See e.g.,* Exhibit 9.

73.      Pace identifies online programs as such before students enroll in, and pay for, those programs.

---

[4]      https://work.chron.com/salaries-playwrights-2483.html

74.     Plaintiff's masters program was never labeled as an online program.

75.     In addition to the fact that online programs are expressly identified as such in advance, they are regularly charged to students at lower rates than in-person programs.

76.     This is the general practice of universities around the country.

77.     It was also Defendant Pace's practice in the past.

78.     Upon information and belief, Defendant's Spring term began on or about January 27, 2020.[5]

79.     Upon information and belief, Defendant's Spring term was scheduled to conclude on or about May 16, 2020.[6]

80.     As a result of the COVID-19 pandemic, Defendant announced on March 10, 2020 that it was transitioning all classes to online classes effective immediately.[7]

81.     In the context of the unique benefits in Plaintiff's program of study, the online classes are not equivalent or comparable to the promised classes that were to be provided in-person.

82.     The move to online instruction was originally supposed to occur until March 29, 2020 but was extended to apply to the remainder of the semester.[8]

83.     As such, Pace has not provided the education, services, facilities, technology, access, or opportunities for which Plaintiff had paid for.

84.     Moreover, Pace has failed to compensate Plaintiff for the diminished value and

---

[5]     https://www.pace.edu/sites/default/files/files/OSA/academic-scheduling/academic-calendar-2019-2020.pdf
[6]     Id.
[7] https://myemail.constantcontact.com/Coronavirus-Update--Remote-learning-starts- tomorrow.html? soid= 1103481471610& aid=T fKERJBMl_w
[8] https://myemail.constantcontact.com/Coronavirus-Update--Spring-Semester--Commencement--and- More.html?soid= 1103481471610&aid=UBum98S-Y2c

damages Plaintiff has suffered as a result of Pace's actions.

85.     Plaintiff left campus on or about March 11, 2020 for spring break, with plans to return on or about March 22, 2020.

86.     Defendant canceled the Rep-Season which was not rescheduled during the current school year.

87.     Defendant has refused to offer any refund whatsoever to Plaintiff.

88.     Defendant has refused to refund any Fees paid, refused to provide a refund for the value lost in switching to online classes, refused to provide a refund for the cancellation of classes, and refused to provide compensation for the cancellation of the Rep-Season.

89.     Although Defendant offered some inferior level of academic instruction via online classes, Plaintiff was deprived of the benefits of in-person classes.

90.     Moreover, a number of classes were entirely canceled by professors rather than being taught online.  In fact, the "Process Lab" class which was used to prepare the plays for the Rep-Season was not held at all once classes went online.  *See,* Exhibit 5, at 2.

91.     However, Defendant failed, and continues to fail, to offer any type of *pro-rated* refund on tuition.

92.     In fact, Defendant has refused, and continues to refuse, to offer any refund whatsoever for online classes, classes canceled, Fees, and the cancellation of the Rep-Season.

93.     Moreover, Defendant has admitted that, because the Rep-Season was not held during Plaintiff's three years of schooling, it is impossible to provide Plaintiff with an equal substitute or "reboot" of the Rep-Season in the future.

94.     To that end, Shawn Lewis, Executive Director ASDS Rep as of March 12, 2020 admitted that if the Rep-Season restarted on August 31, 2020 "some students and staff may not

be able to participate, having moved away from NYC."  Exhibit 6, at 2.

95.     Ms. Lewis' admission is true for all times up to and after August 31, 2020.

96.     Simply put, there is no equal substitute for the lost 2020 Rep-Season as many of the graduates have left New York, never to return.  Some of the students have left the United States; also, never to return.  For example, one of the actors in Plaintiff's play has left the country to go back home to Tunisia.

97.     Further, many of the graduates, including Plaintiff, has sought, and obtained full-time employment.

98.     To replicate the Rep-Season that was promised to Plaintiff during his time at Pace for some time in the future would be impossible for Pace, and extremely expensive for Plaintiff.

99.     For example, Plaintiff's play was first drafted in the Fall of 2017 for specific actors in his class.  After director was chosen, she spent enormous amounts of work with the chosen actors over the course of 2 years to work up the play for the production in the 2020 Rep-Season.

100.    There is no way that any attempt to hold a future Rep-Season could duplicate the years of hard work that went into the development of Plaintiff's play throughout his time at Pace. Any attempt to substitute the actors and director for the development of Plaintiff's play would require enormous amounts of time that are not feasible, or would be extremely expensive to Plaintiff, as Plaintiff would have to leave his job for years while the play is "re-developed" and rehearsed.

101.    Further, Plaintiff, the actors and director have not had have the benefit of a year of Process Lab that was accorded the players to workshop and rehearse the play for preparation for the Rep-Season, and Pace cannot feasibly provide the same experience in the future.  In addition,

for Plaintiff to attempt to duplicate that on his own would also be extremely expensive.

102.    Upon information and belief, to produce a play in the Rep-Season costs a significant amount of time and money.  In fact, upon information and belief, Defendant has documents in its possession which show the "budget" that estimates the costs associated with each individual play for the Rep-Season by week.  Upon and information and belief, this "budget" comes from, at least in part, Plaintiff's tuition and/or Fees.

103.    Yet, Defendant has failed to refund any money to Plaintiff notwithstanding the cancelation of the 2020 Rep-Season and its admitted impossibility of Pace duplicating the Rep-Season in the future.

### FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

104.    Plaintiff realleges all preceding paragraphs as if fully set forth herein.

105.    New York Courts have long recognized that the relationship between a university and its students is contractual.

106.    The terms of the contract between university and student include the rights and obligations of the parties stated in the university's catalogue and other publications.

107.    The interpretation of a university's catalogue and other publications, like the interpretation of any contract, is a matter of law for the Court.

108.    The Court must first determine whether the contract is ambiguous.

109.    An ambiguity exists if a contract provision could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.

110.    If the contract is ambiguous, then the Court should next consider whether there is

relevant extrinsic evidence of the parties' actual intent.

111.    Plaintiff entered into a contract or an implied with Pace upon his acceptance which provided that Plaintiff would pay tuition and Fees for three years.

112.    In exchange, the University promised to provide three full years of in-person classes live in a physical classroom, associated services, and the Rep-Season.

113.    The terms of the contract include the provisions set forth in the University's catalog for Plaintiff's graduate program, which is posted online. *See e.g.,* Exhibit 8 ("Graduate Catalog 2019-2020" for the "Actors Studio Drama School – Acting, Directing, and Playwriting, MFA").

114.    As mentioned above, Pace's website specifically states and promises that from the beginning of the program that the students set out on a "side-by-side journey—as actors directors and playwrights together." Exhibit 10. "Our students and faculty share many intensive classes together and the spirit of collaboration is present in every course and in every project."[9]  Exhibit 10.

115.    The Actors Studio brochure states and promises that "Students perform, write, and direct in a small, full-time class setting, working alongside each other intimately building connections while studying The Stanislavski/Actors Studio Method."[10]   Exhibit 11.

116.    The 2019-2020 catalog[11] states and promises: "A three-year program with three track options, it provides common and specialized course to meet the needs of actors, directors, and playwrights individually and in collaboration as a repertory group.  In the first year, students

_____

[9] https://www.pace.edu/dyson/departments/actors-studio-drama-school/welcomes
[10] http://dysoncollege.uberflip.com/i/194139-actors-studio-graduate-brochure/1?
[11] The Actors Studio had much of the same language printed in the referenced catalog.
http://dysoncollege.uberflip.com/i/194139-actors-studio-graduate-brochure/5?

are immersed in learning acting methodology and language, as well as training in their individual craft.  In the second year, students are introduced to unique collaborative training that encompasses the three disciplines.  In the third year, the three groups apply their knowledge and work together as an ensemble to create and perform in a professionally produced Repertory Season that is presented to the industry and the public.  This program, moreover, offers workshops on auditioning, creating a strong resume, taking a great headshot, effective self-promotion, building industrial networks, and finding job opportunities.'"  Exhibit 8.

117.    From the first year of the program, playwriting students created and developed their Rep-Season plays through specific classes like Playwriting 1 and Playwriting 2 (first year classes where the Rep-Season plays are initially written), Playwriting 3 and 4 (second year classes where the Rep-Season plays are further developed and revised), Playwrights and Directors, Unit 1 and Unit 2 (second year classes that started to develop the actual Rep-Season play with the actors and director), Playwriting 5 and Playwriting 6 (third year classes that were used to revise and edit Plaintiff's play) and Process Lab (third year class that continued to "work up" Plaintiff's play for the Rep-Season).

118.    Plaintiff performed his end of the bargain when he paid tuition for three years for the purposes of preparing for the Rep-Season, including payment for the current Spring 2020 semester along with the required Fees.

119.    Pace breached the contract with Plaintiff by moving all promised in-person classes for the Spring 2020 semester to online classes, and canceling the Rep-Season in the 2019-2020 school year, and specific on-line classes, including the Process Lab class, without reducing or refunding any tuition and the associated Fees.

120.    Pace retained tuition and Fees paid by Plaintiff, without providing him the full

benefit of their bargain.

121.    Pace has admitted "that it has neither offered nor provided a tuition or fee refund."  Dkt. 15 at ¶ 25; see also ¶¶ 27, 35, 49, 50, 53, 54 and 59.

122.    In an effort to unlawfully retain Plaintiff's tuition and Fees, Pace relies on the "Emergency Closings And Other Changes In Class Schedules" announcement in the 2019-2020 Graduate School Course Catalog to justify keeping Plaintiff's fees and tuition.  Dkt. 15 at paragraph 41.

123.    This so-called policy or "contractual term" to the implied contract between Pace and Plaintiff is no defense for it to unlawfully keeping Plaintiff's tuition and Fees.

124.    As Pace knows, the Rep-Season is not a "class," and therefore this so-called policy does not apply.

125.    Pace has even attached Plaintiff's transcript to its Answer to the First Amended Complaint, which does not list a class entitled the "Rep-Season," or the like.  Dkt. 15-5.

126.    Moreover, Pace's announcement is directed to contingencies such as a canceled class due to inclement weather, a professor unavailable due to illness, "malfunction of University equipment (including computers)," or so forth.  It does not apply to the cancellation of the entire Rep-Season, the cornerstone of the graduate playwriting program.

127.    Nor does it apply to Pace's so-called right to reschedule a Rep-Season that was promised to Plaintiff that it would be held during the 2019-2020 school year.

128.    In summary, the Rep-Season is not a class.

129.    The "Emergency Closings And Other Changes In Class Schedules" announcement also does not apply to the Process Lab class which was canceled for no reason after classes went online.

130.    Despite Pace's allegations or promises, Pace will not be offering the Rep-Season in September 2020.

131.    Likewise, there are no definitive plans to offer the 2020 Rep-Season in the future.

132.    Any type of offer to date has been illusory and lacking in any type of definitive terms.

133.    Moreover, a Rep-Season which corresponds to the prepared for 2020 Rep-Season, and which represents the prepared for Rep-Season that was to be the culmination of Plaintiff's three years in his program, cannot be provided in the future.

134.    Pace admits a 2020 Rep-Season cannot be duplicated in the future.

135.    In commenting on the possibility of holding a Rep-Season beginning on August 31, 2020, The Executive Director of the Rep-Season rightfully realized that "Some students may not be able to participate, having moved away from NYC," and that "It will be challenging to get Rep staff and design team back at that time of year."  Dkt. 13-6.

136.    Moreover, the "challenges" if the Rep-Season would supposedly take place in the Spring of 2021 or further into the future are daunting.  The 2020 students have already scattered to all parts of the world.  One of the main actors in Plaintiff's play is home in Tunisia, unlikely to come back to the United States anytime soon.

137.    Likewise, Plaintiff has recently obtained a full-time job that will not permit him to take months off to participate in redeveloping the play with potentially different actors and a director prior to some type of combined Rep-Season – including a yearlong "Process Lab" class (that was never held after Pace went online).

138.    To replicate the Rep-Season, would come at substantial cost and expense to Plaintiff, including the substantial cost to produce and present his play to the public, which is in

excess of $75,000, along with his lost wages during the period of months in which he would have to leave his job to produce and present his play.

139.    Plaintiff has suffered damage as a direct and proximate result of Defendant's breaches, including, but not limited to, being deprived of the value of the services that the tuition and Fees were intended to cover.

140.    As a direct and proximate result of Defendant's breach, Plaintiff is legally and equitably entitled to damages to be decided by the trier of fact in this action, as set forth above, as well and any and all further damages allowable under the law.

## SECOND CAUSE OF ACTION
## (UNJUST ENRICHMENT)

141.    Plaintiff realleges all preceding paragraphs as if fully set forth herein.

142.    Plaintiff brings these claims in the alternative to the breach of contract claim brought in the First Cause of Action.

143.    As an alternative to contract, Plaintiff alleges its claims under the doctrines of unjust enrichment and/or promissory estoppel.

144.    In New York, the elements of unjust enrichment are that the defendant was enriched, at the plaintiff's expense, and that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.

145.    As set forth above, Defendant Pace has been enriched at Plaintiff's expense, with payment of tuition and Fees, and it is against equity and good conscience to permit Defendant to retain all of that tuition and Fees.

146.    Pace University has received a benefit at the expense of Plaintiff, to which it is not entitled.

147.    Over the course of three years, and most particularly in the Spring 2020 season,

Plaintiff paid substantial tuition and Fees for live in-person instruction in physical classrooms, and associated services, and for preparation for the Rep-Season, but did not receive the full benefit of the bargain as set forth more fully above.

148.    Plaintiff conferred this benefit on Defendant when he paid the tuition and Fees.

149.    Defendant has realized this benefit by accepting such payment.

150.    Defendant has retained this benefit, even though Defendant has failed to provide the services for which the tuition and Fees were collected for three years, making Defendant's retention unjust under the circumstances.

151.    Equity requires that the University return the monies paid in tuition and Fees for three years, and the value of the canceled Rep-Season.

152.    Defendant should be required to disgorge and restitute this unjust enrichment and should be required to pay damages therefor.

**THIRD CAUSE OF ACTION**
**(PROMISSORY ESTOPPEL)**

153.    Plaintiff realleges all preceding paragraphs as if fully set forth herein.

154.    In New York, promissory estoppel has three elements: a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance.

155.    Defendant Pace made numerous clear and unambiguous promises regarding its programs and services.

156.    Plaintiff reasonably and foreseeably relied on those promises.

157.    Plaintiff has sustained injury by reason of the reliance.

**FOURTH CAUSE OF ACTION**
**(VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349)**

158.   Plaintiff realleges all preceding paragraphs as if fully set forth herein.

159.   To succeed on a claim under NY GBL § 349, plaintiff must demonstrate that defendant: has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.

160.   Under the objective standard of NY GBL § 349, the challenged representation or omission must be one that is likely to mislead a reasonable consumer acting reasonably under the circumstances.

161.   Pace's acts mentioned herein of providing on-line classes, canceling classes and other school privileges and a Rep-Season were directed at consumers. Pace's acts constituted unlawful, unfair, and fraudulent business practices because students, such as the Plaintiff, were charged and paid for services that were promised to them but which he did not receive.

162.   The above-mentioned acts were misleading in a material way in that Pace requested full tuition and Fees in exchange for in-person classes, access to school facilities and a Rep-Season.

163.   Plaintiff has been damaged by reason of being deceived and misled into paying full tuition and Fees for three years preparing for the Rep-Season, when in-person classes, access to school facilities and a Rep-Season were ultimately not provided.

164.   To that end, Pace's practice was substantially injurious to consumers, such as the Plaintiff, because they denied Plaintiff and other students the value of goods and services to which they were entitled to and unfairly and misleadingly caused Plaintiff and other students to shoulder the entire burden of Pace's COVID-19 shutdown.

165.   With its vastly superior economic resources, Pace unfairly chose to pass the entire burden of the COVID-19 shutdown to students having far less resources, and to have those

students, including the Plaintiff, bear the entire economic burden of that shutdown.

166.    Defendant advertised unique and personal educational services to the public at large, but then refused to provide those services to those who paid for them.

167.    Furthermore, Pace takes the position that it never directly or impliedly promised or necessarily intended to provide in-person instruction.

168.    If that is the case, then Pace has deceptively, unlawfully, and fraudulently led students who enrolled in Plaintiff's program to believe that the program would be an in-person program.

169.    Pace takes the position that it can unilaterally change the type and nature of courses, including converting programs from in-person to online, with no recourse by students whatsoever.

170.    It further takes the position that it has the right, power, and authority to unilaterally do so under any circumstances it chooses.

171.    Plaintiff, and the other students who enrolled in Pace's three-year playwriting program, believed that they were enrolling in a fully in-person program.

172.    When they enrolled, they were never notified or expressly apprised by Pace that Pace took the position that it could unilaterally convert some or all of the courses to online courses, with no recourse by the students.

173.    Nor were they ever notified of Pace's position that it could convert from traditionally more expensive in-person courses to typically less expensive online courses with no refund of the difference to students.

174.    Pace further takes the position that it can modify, or even fully cancel, the Rep-Season, and/or the Process Lab, and/or any other programs or services covered by tuition or

Fees, with no recourse by students, or refund to students.

175.    Defendant Pace further takes the position that any statements, offers, and promises it makes to prospective students in advertisements, promotional materials, and/or its website, are non-binding and unenforceable, and never meant to be binding or enforceable.

176.    Pace takes the position that it has a practice of making statements which it has no responsibility to abide by.

177.    It takes the position that it can engage in the practice of leading students to certain beliefs about Pace's programs, via its advertisements, promotional materials, and/or its website, which Pace then has no responsibility or intention of upholding.

178.    Pace further takes the position that it has the unilateral power to modify or even cancel any and all classes at will with no recourse by students, or refund of tuition.

179.    It takes the position that this is Pace's official policy.

180.    Pace also takes the position that it has unfettered authority to make such decisions.

181.    Pace also takes the position that it has unfettered authority to keep all tuition or Fees, in its sole discretion, regardless of whether it provides the programs and/or services that it promised to students, or that students were led to believe that they would receive.

182.    Pace takes the position that any such decisions are not subject to judicial review.

183.    It takes the position that it can unilaterally engage in such decisions without being subject to the review of the courts in general, or this Court in particular.

184.    Pace's positions and practices are deceptive, unlawful, and fraudulent.

185.    The positions and practices which Pace has adopted in offering its programs to prospective and current students, and in administering its educational institution, are deceptive,

unlawful, and fraudulent.

186.    Defendant has illegally engaged in deceptive acts or practices in the conduct of business trade or commerce or in the furnishing of services in this state.

187.    The aforementioned misleading and deceptive misconduct is ongoing and will continue unless enjoined by the Court.

188.    By reason of the foregoing, Plaintiff is entitled to his actual damages, restitution, disgorgement, and payment of his attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, respectfully requests judgment in its favor and against Defendant as follows:

a.    Declaring that Defendant is liable for breach of contract

b.    Alternatively declaring that Defendant is liable under the doctrines of unjust enrichment and/or promissory estoppel;

c.    Declaring that Defendant is liable under New York General Business Law §349 for misleading and deceptive acts or practices in the conduct of business trade or commerce or in the furnishing of services in this state, including the unlawful, unfair, and fraudulent business practices described herein;

d.    Declaring that Defendant has wrongfully kept monies paid for tuition and other Fees;

e.    Awarding Plaintiff damages for the acts complained of herein;

f.    Awarding Plaintiff contractual damages and/or restitution, and disgorgement of all profits and unjust enrichment that Pace wrongfully obtained from Plaintiff from tuition and other fees as a result for the violations of law and unlawful, unfair, and fraudulent business

practices described herein;

g.      Awarding Plaintiff contractual damages and/or restitution or unjust enrichment damages in the amount sufficient to produce its Rep-Season play that was not produced due to breach of contract or Pace's unjust enrichment;

h.      Awarding Plaintiff contractual damages and/or restitution or unjust enrichment damages for the difference in the cost of the in-person programs and courses and services paid for by Plaintiff, and the online programs, and lesser courses and services provided by Defendant;

i.      Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from retaining the pro-rated, unused monies paid for tuition, and other fees;

j.      Awarding injunctive relief enjoining Defendant from further continuing to practice its misleading, deceptive, unlawful, unfair, and fraudulent business practices;

k.      Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses, as permitted by law;

l.      Awarding pre-judgment and post-judgment interest on any amounts awarded, as permitted by law;

m.      Ordering Pace to engage in a corrective advertising campaign; and,

n.      Awarding such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated:  September 14, 2020                    **GOLDBERG COHEN LLP**

*/s/ Lee A. Goldberg*
Lee A. Goldberg
Morris E. Cohen
Limor Wigder

1350 Ave of the Americas, 3rd Floor
New York, New York 10019
Tel: (646) 380-2087
Fax: (646) 514-2123
lgoldberg@goldbergcohen.com
mcohen@goldbergcohen.com
lwigder@goldbergcohen.com