UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRETT GOLDBERG,

Plaintiff,

-v-

PACE UNIVERSITY,

Defendant.

20 Civ. 3665 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

In spring 2020, confronted with the spread of COVID-19, undergraduate and graduate schools across the country rapidly transitioned to online instruction, to protect students, faculty, and staff.  In response, students at many schools have brought suit, generally sounding in breach of contract, to recover tuition and fees paid for, purportedly, in-person experiences.  Although some courts have construed these claims as impermissible claims of educational malpractice, others have sustained such claims, finding it well-pled that the college or university breached a specific and enforceable contractual promise that learning or other services would be in-person.

Plaintiff Brett Goldberg ("Goldberg") is a performing arts graduate student.  He sues Pace University ("Pace") to recover damages in connection with Pace's transition to remote learning in March 2020 in light of the pandemic.  Goldberg alleges that Pace breached its contract with him by transitioning his last semester to remote learning, postponing the production of his play, and retaining certain fees.  He also brings claims for unjust enrichment and promissory estoppel, and a claim under New York General Business Law  ("GBL") § 349.

Now pending is Pace's motion for judgment on the pleadings, under Federal Rule of Civil Procedure 12(c), for failure to state a claim. For the following reasons, the Court grants in part and denies in part Pace's motion.

## I.   Background

### A.   Factual Background[1]

#### 1.   The Actors Studio Program

As of the start of 2020, Goldberg, an aspiring playwright, was enrolled as a full-time third-year student in Pace's Master of Fine Arts ("MFA") three-year graduate program at The Actors Studio Drama School ("The Actors Studio"). SAC ¶¶ 17–18.

The Actors Studio program anticipated an in-person education, including on Pace's premises in downtown New York City. *Id.* ¶¶ 19, 27. Pace advertised that students in the program—actors, directors, and playwrights—would train "side-by-side" for three years. *Id.* ¶ 27; *see also id.*, Ex. 10 at 3 (welcome letter from late Dean James Lipton on Actors Studio website). It further advertised that the program's "black-box studios for professional training are designed and equipped according to state-of-the-art standards," and emphasized the benefits of

---

[1] The facts are drawn from the Second Amended Complaint, Dkt. 24 ("SAC"), and attached or referenced exhibits cognizable on this motion. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss . . . a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011). Here, the Court has considered the full text of the 2019–2020 Graduate School Course Catalog, which the SAC incorporates by reference. *See* Graduate Catalog 2019-2020, Pace University, https://pace.smartcatalogiq.com/2019-2020/Graduate-Catalog ("Graduate Catalog"); *see also* SAC ¶¶ 29 (linking to portion of Catalog that explains student fees), 50 (relying on Catalog's description of the Rep Season), 106–07 (relying on terms in Graduate Catalog in breach of contract claim), 122 (referencing "Emergency Closings and Other Changes in Class Schedules" portion of Graduate Catalog), 129 (same); *id.*, Ex. 8 (excerpt of Graduate Catalog). For the purpose of resolving the motion to dismiss, the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

the program's New York City location.  *Id.* ¶ 27.  Pace promised, "*inter alia*, networking and

mentorship opportunities, and in-person collaboration with other students and professors,

including but not limited to, readings and 'workshopping' of [Goldberg's] plays and

screenplays."  *Id.* ¶ 19.  Pace further promised "faculty and student collaboration spaces."  *Id.*

In addition to its in-person offerings, Pace offers online programs, which it specifically

identifies before the student enrolls and pays.  *Id.* ¶¶ 72–73.  Goldberg's MFA program,

however, was not labeled as such.  *Id*. ¶ 74.  Pace's online programs are significantly less

expensive than the in-person graduate program in which Goldberg enrolled.  *Id.* ¶¶ 25–26

(describing online Masters in Humanities American History Emphasis Program).

An important feature of the Actors Studio program is its Repertory Season ("Rep-

Season").  It culminates in the third year of the program, when three groups of participants

(actors, directors, and playwrights) work together to create and perform professionally produced

plays for industry professionals and the public.  *See id.* ¶¶ 37, 116; *see also id.*, Ex. 8 (Actors

Studio curriculum information).  The playwriting program is "built around the Rep-Season,"

which gives students an opportunity to present their production to the general public.

Preparation for the Rep-Season begins "with the first-year playwriting class in which the play for

the Rep-Season is chosen."  *Id.* ¶ 32.  The Rep-Season production is "workshopped the entire

second year in an effort to prepare [students] for the production the following year."  *Id.*  In the

third year, the students "hone[]" the production.  *Id.*  Pace advertised Rep-Season as a

distinguishing aspect of its graduate program.  In its marketing materials to aspiring playwrights,

Pace stated that student-developed full-length plays would be staged by the program directors

and actors.  *Id.* ¶ 37.  It further advertised Rep-Season as a unique opportunity to "introduce

graduating students to the professional world and the public in fully-professional productions of

the work they have created during their three years of study." *Id.* ¶ 4; *see also id.* ¶ 36 ("In their final year, all Actors Studio Drama School students present their work to the professional world and the public, in a fully-produced professional Repertory Season at a theater in downtown Manhattan"); *id.*, Ex. 2 (Rep-Season advertisement in Spring 2020 Magazine).

In connection with Rep-Season performances, the third-year curriculum includes a year-long course, "Process Lab," in which student plays are workshopped and rehearsed. *Id.* ¶¶ 32, 101. The Process Lab syllabus indicates that this course would meet in person. *Id.* ¶ 22; *see also id.*, Ex. 7 ("Process Lab Syllabus") (Fall and Spring 2019–2020 semesters). To this end, its syllabus explains that "emails have proven to be counter-productive, [and] all issues regarding the project shall be dealt with in the classroom sessions face-to-face." Process Lab Syllabus at 3. The syllabus also explains how students are to care for the classroom. *See id.* at 4. The SAC alleges that Pace, in general, required students to attend in person, and that failure to do so would harm the student's grade. *See* SAC ¶ 20.

### 2. Impact of COVID-19

On or about January 27, 2020, Goldberg began his final Spring term at Pace. The term was scheduled to conclude on or about May 16, 2020. *Id.* ¶¶ 78–79.

On March 10, 2020, in response to the spreading pandemic, Pace transitioned all classes to online instruction for the remainder of the semester. *Id.* ¶¶ 80, 82. Consequently, Goldberg's classes were moved online. *Id.* ¶ 89. Additionally, Pace put the spring 2020 Rep-Season "on hold." It identified two potential means for rescheduling Rep-Season, contingent on the status of the pandemic—one in which Rep-Season would be held between mid-April and late-May 2020, and the other in which it would be held between September 23 and November 7, 2020. *Id.* ¶ 86; *id.*, Ex. 6 at 1–2 (email from Executive Director discussing 2020 Rep Reboot). Shawn Lewis, the program's executive director, acknowledged that were Pace to choose the second, later

option, "[s]ome students and staff may not be able to participate, having moved away from NYC."  *Id.* ¶ 94; *id.*, Ex. 6.

Goldberg alleges that, beginning in fall 2017, he had drafted his Rep-Season play for specific actors in his class, and that the director with whom he was working spent two years working with the actors in preparation for Rep-Season.  *Id.* ¶ 99.  Goldberg also alleges that he was available in New York City had Pace pursued the later second option.  *See* Ex. 6 at 2. However, given the duration of the pandemic, neither Rep-Season plan came to fruition.  Dkt. 38 ("Answer") ¶ 8.  Pace has since advised program participants that it plans to reschedule the Rep-Season "as soon as reasonabl[y] possible over the summer and fall terms."  Dkt. 28 ("Opp'n") at 16 n.11.  As a result of COVID-19, the corresponding "Process Lab" course in which students prepared Rep-Season plays was also postponed.  Pace has advised program participants that this course, too, will resume once it becomes feasible to hold the Rep-Season.  *See* SAC ¶ 90; *id.*, Ex. 5 at 2 ("It is [Pace's] intention that these [5 Process Lab classes] will be more than made up.").

### 3.   Status of Goldberg's Payments and Fees

Goldberg has fully paid Pace tuition for all three years of his graduate program, including for the spring 2020 semester.  *Id.* ¶ 18.  Goldberg has also paid Pace three mandatory fees. These are the General Institution Fee, which covers "costs associated with ancillary services provided to students which are not covered by tuition,"[2] the University Health Care Fee,[3] and the

---

[2] The General Institution Fee covers ancillary services such as "advisement, registration, tutoring and writing centers, library services, co-op and career services, inter-campus transportation, safety and security, parking, and athletic activities."  Graduate Catalog, *Special Course Fees*, https://pace.smartcatalogiq.com/en/2019-2020/Graduate-Catalog/General-University/Tuition-and-Fees/Special-Course-Fees/.

[3] The University Health Care Fee "supports the existence of the University Health Care Unit[s] that are located on the New York City and Pleasantville Campuses."  Graduate Catalog, *Special Course Fees*.  That unit is available to all Pace students "whether or not the student chooses to

Technology Fee.[4]  *Id.* ¶¶ 28–29.  Pace states that it has consolidated the services comprising each fee into "one concise fee."  Graduate Catalog, *Special Course Fees*.

Pace has not reimbursed any portion of Goldberg's tuition or the mandatory fees.  SAC ¶¶ 8–9, 30.  Goldberg alleges that as a result of being barred from campus during the pandemic, he has been unable to benefit from the services that the mandatory fees were intended to cover. *Id.* ¶ 30.

Pace's Graduate Catalog contains an "Emergency Closings and Other Changes in Class Schedules" provision.  Relevant to tuition or fee refunds, it states that Pace may adjust class schedules and extend "time for completion of class assignments" in the event of "unforeseen circumstances."  *See* Answer, Ex. C; *see also* Graduate Catalog, *Emergency Closings and Other Changes in Class Schedules*, https://pace.smartcatalogiq.com/2019-2020/Graduate-Catalog/Academic/Academic-Policies-and-General-Regulations/Emergency-Closings-and-Other-Changes-in-Class-Schedules.  In the event of such an occurrence or a "failure of a class to conclude on the date originally scheduled," the Graduate Catalog states, Pace "shall not be responsible for the refund of any tuition or fees."  Graduate Catalog, *Emergency Closings and Other Changes in Class Schedules*.

### B.    Procedural History

On May 13, 2020, Goldberg filed the initial complaint, seeking recoupment of tuition and fees attributable to the period after Pace commenced online learning.  Dkt. 4.  On July 19, 2020, Goldberg filed an amended complaint, Dkt. 13, which Pace answered, Dkt. 15.  On September 4,

---

make use of these facilities." *Id.*  The fee also covers some services provided by the Counseling and Personal Development Centers.  *Id.*

[4] The Technology Fee "goes directly towards funding instructional technology initiatives that are focused on enhancing the student learning experience."  Graduate Catalog, *Special Course Fees*.

2020, Pace moved to dismiss under Rule 12(b)(1), claiming lack of subject-matter jurisdiction, and for judgment on the pleadings under Rule 12(c).  Dkts. 21–22.

On September 8, 2020, the Court held an initial pretrial conference, at which it raised questions about Goldberg's basis for claiming an amount in controversy above $75,000, so as to support diversity jurisdiction, and authorized Goldberg to file a second amended complaint with clearer allegations as to the amount in controversy.  Dkt. 23.  On September 14, 2020, Goldberg filed the SAC.  SAC.  On September 28, 2020, Pace University again moved for judgment on the pleadings under Rule 12(c), this time, seeking dismissal solely on the ground that the SAC does not state a claim.  *See* Dkt. 27 ("Mem.") at 3 n.1.  On October 13, 2020, Goldberg filed an opposition.  *See* Opp'n.  On October 20, 2020, Pace filed a reply.  Dkt. 29 ("Reply").  On January 12, 2021, Pace submitted a notice of supplemental authority.  Dkt. 32.  On January 19, 2021, Goldberg responded to that notice.  Dkt. 34.

On January 20, 2021 the Court issued an order noting that Pace had answered the FAC, not the SAC, and directing Pace to file an answer to the SAC.  Dkt. 37.  On January 25, 2021, Pace University did so.  Answer.

## II.      Applicable Legal Standards

Under Rule 12(c), a party may move for judgment on the pleadings "[a]fter the pleadings are closed" but "early enough not to delay trial."  Fed. R. Civ. P. 12(c).  A court resolving a motion under Rule 12(c) applies the standards applicable to a motion to dismiss under Rule 12(b)(6).  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where,

as a matter of law, "the allegations in a complaint, however true, could not raise a claim of

entitlement to relief." *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court

must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the

plaintiff." *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions.  *See*

*Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic

recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.    Discussion

Goldberg's lawsuit to recoup tuition and fee payments from Pace is one of many actions,

brought in New York[5] and elsewhere,[6] seeking compensation from colleges and graduate schools

for their decisions in March 2020 to move instruction online, suspend in-person services, and

close facilities.  In New York, many such transitions, and lawsuits, followed Governor Cuomo's

---

[5] *See, e.g.*, *Hassan v. Fordham Univ.*, No. 20 Civ. 3265 (KMW), 2021 WL 293255 (S.D.N.Y. Jan. 28, 2021) (putative class of undergraduates seeking recoupment of tuition and fees); *Bergeron v. Rochester Inst. of Tech.*, No. 20 Civ. 6283 (CJS), 2020 WL 7486682 (W.D.N.Y. Dec. 18, 2020) (same); *Ford v. Rensselaer Polytechnic Inst.*, No. 20 Civ. 470, 2020 WL 7389155 (N.D.N.Y. Dec. 16, 2020) (same).

[6] *See, e.g.*, *Gociman v. Loyola Univ. of Chicago*, No. 20 Civ. 3116, 2021 WL 243573 (N.D. Ill. Jan. 25, 2021); *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, No. 20 Civ. 927 (ORL) (EJK), 2021 WL 140708 (M.D. Fla. Jan. 14, 2021); *Student "A" v. Hogan*, No. 20 Civ. 1434 (CCB), 2021 WL 119083 (D. Md. Jan. 13, 2021); *Bridget McCarthy v. Loyola Marymount Univ.*, No. 20 Civ. 04668 (SB), 2021 WL 268242 (C.D. Cal. Jan. 8, 2021); *Hiatt v. Brigham Young Univ.*, No. 20 Civ. 100 (TS), 2021 WL 66298 (D. Utah Jan. 7, 2021); *Doe v. Bradley Univ.*, No. 20 Civ. 01264, 2020 WL 7634159 (C.D. Ill. Dec. 22, 2020); *Lindner v. Occidental Coll.*, 2020 WL 7350212 (C.D. Cal. Dec. 11, 2020); *Chong v. Ne. Univ.*, No. 20 Civ. 10844, 2020 WL 5847626 (D. Mass. Oct. 1, 2020); *Gibson v. Lynn Univ., Inc.*, No. 20 Civ. 81173 (RAR), 2020 WL 7024463 (S.D. Fla. Nov. 29, 2020); *Saroya v. Univ. of the Pac.*, No. 20 Civ. 3196 (EJD), 2020 WL 7013598 (N.D. Cal. Nov. 27, 2020); *Rosado v. Barry Univ. Inc.*, 20 Civ. 21813 (JEM), 2020 WL 6438684 (S.D. Fla. Oct. 30, 2020); *Salerno v. Fla. S. Coll.*, 488 F. Supp. 3d 1211 (M.D. Fla. 2020).

issuance of executive orders declaring a state of emergency and suspending in-person education. *See* N.Y. Exec. Order No. 202 (Mar. 7, 2020) (declaring a state of emergency); N.Y. Exec. Order No. 202.8 (Mar. 20, 2020) (requiring 100% reduction in in-person workforces for non-essential businesses). Suits seeking repayment of tuition or fees have yielded mixed results, with some courts sustaining claims of a breach of specific and enforceable promises that learning would be in-person,[7] and others dismissing such claims.[8]

The Court has particularly benefited from Judge Furman's thoughtful recent decision resolving motions to dismiss in *In re Columbia Tuition Refund Action*, Nos. 20 Civ. 3208, 20 Civ. 3210 (JMF), 2021 WL 790638 (S.D.N.Y. Feb. 26, 2021) ("*Columbia*"). That decision addressed claims by two putative classes of students—from Columbia and Pace Universities—who sought to recover tuition and fees as a result of the shift to online learning. Although holding that the students' claims for breach of contract were not prohibited "educational malpractice" claims, Judge Furman dismissed the Columbia students' breach-of-contract claims for failure to identify a specific enforceable promise that instruction would take place in person. *See id.* at *3–4. As to Pace, however, it had, allegedly, included in its course registration portal the statement that on-campus classes would be "taught with *only* traditional in-person, on-campus class meetings." *Id.* at *5 (emphasis in original). Judge Furman accordingly sustained the Pace students' claims for breach of contract. He further found that a provision in Pace's student manual on which Pace also relies here—advising students of the prospect of "Emergency

---

[7] *See, e.g.*, *Bergeron*, 2020 WL 7486682, at *6–8; *Ford*, 2020 WL 7389155, at *3–8; *Rosado*, 2020 WL 6438684, at *3–5.

[8] *See, e.g.*, *Gociman*, 2021 WL 243573, at *3–5; *Lindner*, 2020 WL 7350212, at *7–9; *Hassan*, 2021 WL 293255, at *4–10.

Closings and Other Changes in Class Schedules"—did not require dismissal on the pleadings, because it was at least ambiguous whether a shift to online learning constituted a schedule change. *Id.* Judge Furman also left standing the Pace students' contract claims seeking recovery of certain of the General Fees, Activity Fees, Health Center Fees, and Technology Fees they had paid. *Id.* at 8.

Aspects of Judge Furman's analysis are apposite if not controlling here, including as to claims by Goldberg that track claims by the Pace undergraduates (*e.g.*, to recoup certain fees). On the other hand, the distinct context of the Pace performing arts graduate program, and the offerings unique to that program such as the Rep-Season and Process Lab, make inapposite other aspects of the analysis in *Columbia*.[9]  Goldberg's SAC, in fact, repeatedly emphasizes the distinct context of his program, alleging that it (and particularly its Rep Season component) anticipated in-person collaboration among the writers, actors, and directors participating in producing plays.

The Court considers, at the threshold, Pace's argument that the SAC's claims all are impermissible ones of educational malpractice.  The Court then evaluates whether the SAC's contract claims—which allege breaches of promises to provide (1) in-person instruction, (2) the Rep-Season production, (3) the Process Lab class, and (4) in-person services in exchange for fees—state a claim.  The Court, finally, evaluates the SAC's remaining claims, for unjust enrichment, promissory estoppel, and violation of N.Y. GBL § 349.

### A.    Educational Malpractice

Claims for "educational malpractice"—which "ask the Court to involve itself in the subjective professional judgments of trained educators"—are not cognizable under New York

---

[9] For this reason, this Court and Judge Furman have not treated the two cases as related.

law.  *See Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998).  Such claims, in

essence, allege that a school "breached its agreement to provide an effective education," and ask

a court to "evaluate the course of instruction" or "review the soundness of the method of

teaching that has been adopted by an educational institution."  *Hassan*, 2021 WL 293255, at *3

(citation omitted); *see Gally*, 22 F. Supp. 2d at 207.  Claims so alleging must be dismissed even

if otherwise packaged—*e.g.*, as alleging breach of contract.  *See Gally*, 22 F. Supp. 2d at 207.  In

light of this doctrine, courts assessing a student's lawsuit against a school must exercise "'utmost

restraint,'" *Hassan*, 2021 WL 293255, at *2 (quoting *Baldridge v. State*, 293 A.D.2d 941, 943

(3d Dep't 2002)); *see also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81,

94 (2d Cir. 2011), to not "substitute their judgment for that of university officials" as to

educational content or "review the day-to-day administration of academic policies," *Sirohi v.*

*Lee*, 222 A.D.2d 222, 222 (1st Dep't 1995).

     The educational-malpractice doctrine, however, does not proscribe all student claims

against universities for breach of contract.  *See Hassan*, 2021 WL 293255, at *3 (citing *Ansari v.*

*N.Y. Univ.*, 1997 WL 257473, at *3 (S.D.N.Y May 16, 1997)).  Many enforceable promises by a

university or school do not entail forbidden inquiries.  In particular, where a contract has

promised the student "specified services" which the university has failed to provide, a claim may

lie.  *Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 92 (2d Dep't 1982).

     Pace here depicts Goldberg's contract claims are thinly disguised claims of educational

malpractice, insofar as Goldberg urges that the online instruction that Pace offered beginning in

March 2020 was less "effective and valuable" than the in-person, on-campus education it had

offered pre-pandemic.  Mem. at 13.  Pace argues that, after New York State banned in-person

education, its administrators and faculty made a "judgment as professional educators" that

"effective instruction could continue remotely." *Id.* at 14.  Pace depicts Goldberg's lawsuit as claiming that the caliber of the remote instruction that Pace's faculty thereafter provided was substandard—a claim Pace depicts as, implicitly, for educational malpractice.  *Id.*

Pace's characterization of Goldberg's claims is off-base.  Fairly read, the SAC does not question Pace's decision to move to remote learning.  On the contrary, it all but acknowledges its inevitability, recognizing that in March 2020, eliminating in-person classes was "important in view of the current pandemic."  SAC ¶ 2.  And the SAC's claims do not turn on the contention that Goldberg's online education was less efficacious than his earlier in-person classes.  The SAC does contain statements to this effect. *See, e.g.*, *id.* ¶¶ 40, 45, 81.  But such statements are mostly made in the service of aspects of the SAC's contract claims: that Pace had represented in its syllabus that the Process Lab would be in person because "emails have proven to be counter-productive, and all issues regarding the project shall be dealt with in the classroom sessions face-to-face," *id.* ¶ 23 (citing Process Lab Syllabus), and that Goldberg had chosen Pace based on its purported promise of in-person instruction, viewing such as more effective, *id.* ¶ 24.

The heart of the SAC's breach-of-contract claim is not, however, that Goldberg's online learning was substandard—a claim that would be barred as an impermissible one of "educational malpractice." *Paladino*, 89 A.D.3d at 87–90.  It is instead that Pace allegedly made specific promises to students in Goldberg's program that instruction would be in person, including the third-year Rep-Season and "Process Lab," and that Goldberg paid Pace tuition and fees in exchange for specific in-person experiences and services.  On the basis of such promises, the SAC alleges, Goldberg chose Pace's "hands on," in-person program over a less expensive online program.  SAC ¶ 19; *see also id.* ¶ 26 (alleging that Pace charges approximately six times as

much for three-credit classes in the Actors Studio program as for online master's classes in the Humanities American History Emphasis Program).

The Court evaluates, *infra*, where these claims are well-pled. But, read as a whole, the SAC does not ask the Court to "review the soundness of the method of teaching that has been adopted by an educational institution," *Paladino*, 89 A.D.3d at 90, or attack "the judgments of educational professionals," *Hassan*, 2021 WL 293255, *3. Instead, at heart, its theory is that an agreement existed between Goldberg and Pace, and that Pace—however benign its motives and whatever the quality of the new remote offerings—breached a specific promise to furnish Goldberg with in-person instruction and services in exchange, respectively, for tuition and fees. The proper question on Pace's motion to dismiss is thus "whether the content of [the Graduate Catalog and other promotional materials] constitute[d] . . . a specific promise" enforceable under New York contract law. *Id.* Accordingly, the Court understands Goldberg's claim to be not that Pace's online education was "subpar or ineffective, but rather that it was a materially different product than the in-person education to which [he] was allegedly entitled," and declines to dismiss the SAC's claims as prohibited educational-malpractice claims. *Columbia* 2021 WL 790638, at *6 (quotation marks omitted) (noting that courts have mostly declined to dismiss, on this ground, claims arising out of universities' transitions to remote learning) (collecting cases).

### B.    Breach of Contract

The SAC alleges that Pace breached an implied contract to provide four in-person services in exchange for tuition or fees: (1) in-person instruction, (2) the seven-week Rep-Season production, (3) the Process Lab course, and (4) services covered by Pace's General Institution, Health Care, and Technology Fees. It alleges that an implied contract specifically promising these in-person offerings arose from Pace's advertisements, emails, syllabi, welcome letters,

webpages describing the curriculum, and Graduate Catalog.  In considering these claims, the

Court draws all reasonable inferences in favor of non-movant Goldberg.

### 1.    Legal Standards Governing Implied Contracts Between Students and Universities

To establish a contract breach under New York law, a plaintiff must show: "(1) the

existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach

of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan

Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004).

Under New York law, there exists an implied contract between a student and their college

or university.  *See Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 405 (W.D.N.Y

2017); *see also Papelino*, 633 F.3d at 93 ("Under New York law, an implied contract is formed

when a university accepts a student for enrollment.").  "The essence of the implied contract is

that an academic institution must act in good faith in its dealings with its students." *Olsson v.

Bd. of Higher Educ.*, 49 N.Y.2d 408, 414 (1980).  "The terms of that contract are contained in

the 'bulletins, circulars and regulations made available to the student.'"  *Hassan*, 2021 WL

293255, at *4 (quoting *Gally*, 22 F. Supp. 2d at 206); *see also Papelino*, 633 F.3d at 93 (same);

*Chira v. Columbia Univ. in N.Y.*, 289 F. Supp. 2d 477, 485 (S.D.N.Y 2003) (dismissing claims in

which student failed to identify a "document or conversation that gives rise to a promise which

Columbia breached").

To state a claim for breach of this implied contract, "a student must identify 'specifically

designated and discrete promises.'"  *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370

(S.D.N.Y 2016) (quoting *Ward v. N.Y. Univ.*, No. 99 Civ. 8733 (RCC), 2000 WL 1448641, at *4

(S.D.N.Y. Sept. 28, 2000)).  "[T]he mere allegation of mistreatment without the identification of

a specific breached promise or obligation does not state a claim on which relief can be granted."

*Gally*, 22 F. Supp. 2d at 207.  Accordingly, a court's "review of plaintiff['s] contractual claims is circumscribed to enforcing specific promises."  *Ford*, 2020 WL 7389155, at *3.  "General policy statements and broad and unspecified procedures and guidelines will not suffice."  *Nungesser*, 169 F. Supp. 3d at 370 (cleaned up).  "The interpretation of a university's catalogue, like the interpretation of any contract, is a matter of law for the Court."  *Deen v. New Sch. Univ.*, No. 05 Civ. 7174 (KMW), 2007 WL 1032295, at *2 (S.D.N.Y. Mar. 27, 2007).

### 2.  Goldberg's Claim as to In-Person Instruction

The SAC alleges that Pace specifically promised Goldberg in-person learning in exchange for the tuition he paid, and it did so via statements in its advertisements, syllabus, and official catalogues.  Specifically, the SAC notes Pace's advertisement of the Actors Studio, in which it states that playwrights will train "side-by-side" with actors and directors throughout the three-year program.  SAC ¶¶ 27, 114; *see also id.*, Ex. 10 at 3 (welcome letter from late Dean James Lipton on Pace's Actors Studio website).  Pace's Graduate Catalog also touts the collaborative nature of the program's third-year curriculum.  *See id.* ¶ 116; *see also* Ex. 8 at 1 ("In the third year, the three groups apply their knowledge and work together as an ensemble . . . .").  And, the SAC notes, Pace's general policy is to require students to attend in-person classes, and absence can affect the student's graces.  *See id.* ¶ 20.  The SAC also notes that, unlike Goldberg's MFA program, Pace offers programs labeled as online programs, which are significantly less expensive than Goldberg's in-person graduate program.  *Id.* at ¶¶ 25–26, 72–74.  Finally, the SAC notes that statements in the Process Lab syllabus presuppose, at a minimum, that the Process Lab meets in person.  *See* Process Lab Syllabus at 3–4 (requiring students to discuss problems "face-to-face" and maintain an orderly classroom).

Goldberg's claim of a breach of a contractually enforceable promise that instruction will be in-person fails.  The statements on which he relies, although tacitly presupposing and almost

certainly envisioning the familiar norm of in-person instruction, do not contain or constitute a specific promise of such. Pace notes the cooperative aspect of the program's curriculum and courses, but it does not anywhere state that this collaboration must occur in person. *See Ward*, 2000 WL 1448641, at *4 ("general policy statements" and "broad unspecified procedures and guidelines" will not suffice). A close review of Pace's Graduate Catalog and advertising materials does not identify any specific promise or commitment that the Actors Studio classes will meet in person. *See Gally*, 22 F. Supp. 2d at 208 (finding that "general promises about ethical standards" are not specific enough to sustain a valid breach of contract claim against a university). That Pace offers exclusively online programs does not imply that students in traditional in-person programs, like Goldberg's program, were promised exclusively in person instruction. *See Columbia*, 2021 WL 790638, *4 (that Columbia offers "fully online" programs does not imply that students in "*other* programs, such as Plaintiffs, were contractually entitled to exclusively in-person instruction"). And statements in the Process Lab syllabus do not imply a contractual promise for in-person instruction. Rather, they describe, but do not commit to, regular practice. *See id.* (references to "classroom locations and physical attendance requirements" in syllabi "memorialize the pre-pandemic practice" but do not serve as guarantees to continue "indefinitely").

In this respect, Goldberg's claims are usefully compared and contrasted with those in recent cases addressing, on the pleadings, similar claims of a breach of a promise of in-person education. In *Hassan*, on route to dismissing such a claim brought against Fordham University, the court examined the two cases in this Circuit (*Ford* and *Bergeron*) holding a plaintiff to have adequately pled a breach of such specific promises. *See* 2021 WL 293255, at *6–7. In *Ford*, the court relied upon Rensselaer Polytechnic Institute's description of the program at issue as a

"time-based clustering and residential commons program" that "extends learning across the
spectrum of student residential life," and noted that the institute had used the mandatory verb
"will" in describing its commitment to such an offering.  2020 WL 7389155, at *4 (recognizing
that courts have refused to "open up [a university] to liability" for a breach of a general
"commitment to 'fairness' in its administrative proceedings," but declining to "us[e] that line of
reasoning to absolve a school of its liability for not providing a program that it claimed in
circulars that it 'will' provide.").  And in *Bergeron*, Rochester Institute of Technology had
pointedly contrasted its "in-person, hands-on programs [with its] fully online distance learning
programs," assigning these two modes of study significantly different price points, and treating
them as mutually exclusive, in that students enrolled in online programs were forbidden to enroll
in in-person classes.  2020 WL 7486682, at *1.

   *Hassan* contrasted these statements with the more general statements by Fordham on
which the plaintiff before the *Hassan* court had relied.  These consisted of policies requiring
students to attend in-person classes and catalog statements describing certain classes as in-person
and others as online only.  *Hassan*, 2021 WL 293255, at *5.  These descriptors, *Hassan* held, did
not rise to the level of specific promises.  *Id.* at *6 (contrasting case with the "multitude of
promises" made by the Rochester Institute in *Bergeron* as to the benefits of its "more expensive
in-person, on-campus program").  The statements by Pace on which Goldberg relies here are
more akin to those in *Hassan* than those in *Ford* and *Bergeron*.  Based on the SAC, Pace is not,
for example, alleged to have contrasted its in-person program with its online program, made
participation in the two mutually exclusive, assigned different price points to in-person and
online versions of the same class or program, or to have used mandatory verbs committing to in-

person teaching.[10]  And to the extent the SAC relies on Pace's general attendance policy, *Hassan*
is again on point.  It rejected the claim that an attendance requirement for a class equates to a
specific promise that the class will invariably be held in person.  "[T]racking attendance is not a
policy that on its face applies only to an in-person course."  *Hassan*, 2021 WL 293255, at *6; *see
also Lindner*, 2020 WL 7350212, at *8 ("[R]egular class attendance is possible during both in-
person and virtual instruction.").  The Actors Studio attendance policy is no different.

Judge Furman's analysis in *Columbia* is in accord.  *Columbia* dismissed Columbia
students' claim for failure to plead any specific promise of in-person instruction.  *See* 2021 WL
790638, at *3–4.  The students there noted that (1) "their syllabi, departmental policies and
handbooks, and online course registration portal" mentioned "meeting schedules, locations, and
physical attendance requirements," (2) Columbia offers "fully online" programs, and (3) multiple
"provisions of Columbia's publications descri[be] the on-campus experience" but the court held
these facts insufficient to establish specific promises by Columbia to provide exclusive in-person
instruction.  *Id.*

Judge Furman, in contrast, sustained the breach-of-contract claim brought by the Pace
undergraduate student for failure to maintain in-person instructional format.  *See id.* at *5–6.  But
this claim survived because Pace's course registration portal on its website stated that "'on-
campus' courses would be 'taught with *only* traditional in-person, on-campus class meetings.'"
*Id.* at *5 (emphasis in original).  By contrast, the SAC does not allege that Goldberg used the

---

[10] The closest the SAC comes is to note that Pace offers online masters programs at a lower
price.  *See* SAC ¶¶ 25–26.  But, critically, it does not plead that Pace offers an online, lower-cost
version of the Master of Fine Arts program—the program in which Goldberg enrolled.  The SAC
instead describes a completely different master's program offered online: the Masters in
Humanities American History Emphasis Program.  *Id.*

same portal to register for his graduate courses.  Nor does the SAC allege that Pace, anywhere, specifically promised that there would be "only" in-person class meetings for Goldberg's MFA classes.  The SAC has not pled a specific enforceable promise to its MFA students that learning would be in person.

Accordingly, the SAC does not state a claim for breach of an implied contract with respect to Pace's transition to online learning.

### 3. Rep-Season

The SAC next alleges that Pace breached a specific promise to hold a seven-week Rep-Season in which all Actors Studio students perform plays written by the students, including Goldberg.  As to this claim, the SAC adequately alleges a specific promise.  However, it does not allege, at least yet, a breach.

 In marketing the Rep-Season to aspiring playwrights, Pace highlights the opportunity for students to develop full-length plays and states that the program will "introduce graduating students to the professional world and the public" through the production of these plays at a downtown Manhattan theater.  SAC ¶ 4; *see also id.*, Ex. 2 (Rep-Season advertisement in the Spring 2020 Magazine).  Unavoidably, Pace's statements rise to the level of a specific promise to the student of an opportunity to participate in the Rep-Season program.  As the SAC and cognizable materials make clear, Rep-Season is a defining feature of Pace's Actors Studio program, which Pace markets as a rare opportunity for an aspiring playwright to showcase his or her work in one of the nation's most vibrant theater districts, and thereby meet leading producers and other theater professionals.  Pace's advertisements and curriculum make Rep-Season a guaranteed feature, if not a centerpiece, of the program for which the student pays tuition.  Pace does not dispute this.  And as the SAC further pleads, a student could not replicate this opportunity on his own.  Apart from other barriers to entry, the student would incur forbidding

costs to produce a play in New York City on her own, including rent, "costumes, lighting, fees for a director, actors, set designers (lighting, sound, and props), rehearsal space, and payment to the actors and director for rehearsal, advertising, and marketing." *See id.* ¶¶ 53–54.

However, the SAC does not plead a breach—yet—of this promise. The SAC does not allege that Pace has refused to offer Goldberg participation in Rep-Season. It alleges no more than that Pace has postponed Rep-Season pending abatement of the pandemic. *See id.* ¶¶ 130–32; *see also* Opp'n at 16 n.11. And the materials cognizable on this motion make clear that Pace was within its contractual rights to postpone Rep-Season on account of the pandemic. The Graduate Catalog, in a section entitled "Emergency Closings and Other Changes in Class Schedules," states that "unforeseen circumstances may necessitate adjustment to class schedules and extension of time for completion of class assignments."[11]  Graduate Catalog, *Emergency Closings and Other Changes in Class Schedule*. It adds: "The University shall not be responsible for the refund of any tuition or fees . . . for failure of a class to conclude on the date originally scheduled." *Id.*  The pandemic and the order of Governor Cuomo declaring a state of emergency qualify as such circumstances. Pace's deferral of Rep-Season thus did not constitute a breach of any promise to Goldberg.

To be sure, the SAC alleges that Pace will ultimately prove unable to adequately replicate the Rep-Season it promised Goldberg. *See* SAC ¶ 93. It alleges that Rep-Season participants from Goldberg's graduate class have left New York or have obtained full-time employment elsewhere, including Goldberg himself. *Id.* ¶¶ 96–97. It notes that the executive director of

---

[11] In *Columbia*, the Court found this language ambiguous as to whether "changing the format of a class from in-person to online constitutes an 'adjustment to class schedules.'" 2021 WL 790638, at *5. However, this language is on point here, inasmuch as postponing Rep-Season is fairly pled to have been an "adjustment to [the] class schedule[]."

Pace's Rep-Season has admitted that "[s]ome students and staff may not be able to participate, having moved away from NYC." *Id.* ¶ 94; *see also id.*, Ex. 6 at 2.

But any claim that Goldberg may one day be denied a viable Rep-Season is not properly adjudicated now.  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotation marks omitted).  The pandemic remains a fact of life, albeit a gradually receding one, and the SAC does not allege that Pace has yet set out for Goldberg the form and timing and other metes and bounds of the Rep-Season that it has indicated it will eventually offer him in lieu of the Rep-Season that was to have occurred in spring 2020.  And, correspondingly, Goldberg has not been able to identify with specificity why the future Rep-Season as offered will fall short of what was contractually promised, beyond conjecturing that he or others whose participation he envisioned will be out of town.  The Court accordingly denies this claim as unripe, without prejudice to Goldberg's right to bring a concrete such claim in the future.  *See, e.g.*, *Longway v. Jefferson Cnty. Bd. of Supervisors*, 24 F.3d 397, 400 (2d Cir. 1994) (issue is ripe for "resolution only if it presents a real, substantial controversy, not a mere hypothetical question" (cleaned up)).

### 4.    Process Lab

For much the same reasons, Goldberg's breach-of-contract claim with respect to the postponement of "Process Lab," a required course in his program in which students develop and prepare their plays for Rep-Season, SAC ¶ 32; *id.*, Ex. 3, does not presently state a claim.  The SAC claims that the failure to hold Process Lab as scheduled was a breach.  *Id.* ¶ 43.  But the SAC also alleges that Pace has stated that it will hold the five outstanding Process Lab sessions once the Rep-Season is officially rescheduled.  *Id.* ¶ 42.  And as noted above, the Graduate Catalog explicitly permits Pace to defer classes in the case of unforeseen circumstances.  There

accordingly has not, yet, been a breach of Pace's promise to offer Process Lab.  The Court therefore dismisses this claim, without prejudice to Goldberg's right to bring a claim along these lines in the future.

### 5.      Mandatory Fees

As noted, Pace charges mandatory fees in exchange for non-academic services, as set out online in the Graduate Catalog.  Goldberg alleges that he paid these fees, including the General Institution Fee, University Health Care Fee, and Technology Fee, *id.* ¶ 28, but that, after access to campus became restricted, he no longer had practical access during the 2020 spring term to the corresponding services, *id.* ¶ 30.[12]

Specifically, Pace's General Institution Fee covers "ancillary services" such as "advisement, registration, tutoring and writing centers, library services, co-op and career services, inter-campus transportation, safety and securities, parking, and athletic activities."  *See* Graduate Catalog, *Special Course Fees*.  The SAC alleges that Goldberg no longer had access to the libraries or the ability to participate in student activities.  SAC ¶ 30.

Pace's Health Care Fee "supports the existence of the University Health Care Unit[s] that are located on the New York City and Pleasantville Campuses . . . .  The UHCU is available to all Pace Students."  *See* Graduate Catalog, *Special Course Fees*.  The fee covers services furnished by the "Counseling and Personal Development Centers."  *Id.*  The SAC alleges that the campus closure deprived Goldberg of in-person access to the "university healthcare unit."  SAC ¶ 30.

---

[12] The Court assumes that these fees, as the SAC presupposes, were for services during the term at issue.  Unlike in connection with the Rep-Season or Process Lab, Pace has not argued as to these services that it was exercising a contractual right to defer offering them until campus reopened.

Finally, in connection with the Technology Fee, Pace promises to "ensure students have access to the latest instructional technology resources available."  *See* Graduate Catalog, *Special Course Fees*.  The SAC pleads that the campus's closure deprived Goldberg of use of Pace's computer labs.  SAC ¶ 30.

The SAC narrowly states plausible clams that Pace breached its contract to provide access to some on-campus facilities and activities covered by these fees in exchange for Goldberg's paid fees.  The pled facts indicate that some, but not all, services in connection with the fees were not provided as contractually promised.  *See id.*  Thus, these facts support a plausible claim of breach of contract to provide at least some of the services promised.

Judge Furman's analysis of the same Pace fees in *Columbia* is on point here.  The Pace students there brought contract claims to recover the same fees at issue.  *Columbia*, 2021 WL 790638 at *8.  Judge Furman found that the complaint against Pace had "narrowly state[d] a plausible claim" that Pace breached its contract by failing to provide access to some facilities and activities in exchange for the fees paid.  *Id.*  The pleadings in that case provided roughly similar detail to that alleged by Goldberg here.  The Court accordingly similarly denies Pace's motion for judgment on the pleadings as to Goldberg's claim for fees.

### C.     Unjust Enrichment

To establish unjust enrichment, a plaintiff must show that (1) "the defendant was enriched"; (2) "at the plaintiff's expense"; and (3) "equity and good conscience" requires restitution for what the plaintiff seeks to recover.  *Briarpatch Ltd, L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (citing *Clark v. Daby*, 300 A.D.2d 732, 732 (3d Dep't 2002)).

Under New York law, a plaintiff may not recover under quasi-contract claims such as unjust enrichment where an enforceable contract governs the same subject matter.  *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir.

2005) (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 388 (1987)); *see also*

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 483 (S.D.N.Y.

2014) (unjust enrichment claim "not available where it simply duplicates, or replaces, a

conventional contract or tort claim" (internal citations omitted)).  However, where the unjust

enrichment involves subject matter "not covered by a valid, enforceable contractual obligation,"

that claim is not duplicative of a contract breach claim and need not be dismissed.  *Spirit Locker,*

*Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 305 (E.D.N.Y. 2010) (declining to dismiss unjust

enrichment claim where subject matter was not covered by an enforceable contractual

obligation).

 Here, the SAC alleges that Pace was unjustly enriched at Goldberg's expense insofar as

he had paid tuition to cover "live in-person instruction in physical classrooms and associated

services" as well as for "preparation for the Rep-Season."  SAC ¶¶ 145–47.  Pace makes two

arguments for dismissal.  First, it argues, this claim covers the subject matter of Goldberg's

contract with Pace.  Mem. at 19 (citing *Jeffers v. Am. Univ. of Antigua*, 125 A.D.3d 440, 443

(1st Dep't 2015)).  Second, it argues, equity and good conscience do not require a refund,

because Pace's campus closure was done to protect students and faculty and in response to an

executive order, and Pace did not deny Goldberg either instruction or credit for the spring

semester.  *Id.* at 20.

 The Court dismisses the unjust-enrichment claim on both grounds.  First, as noted, an

implied contract existed between Pace and Goldberg regarding Goldberg's education.  Goldberg

thus may not recover in quasi-contract for Pace's asserted breach.  *See Reilly v. Natwest Mkts.*

*Grp. Inc.*, 181 F.3d 253, 263 (2d Cir. 1999).  The duplication here is particularly acute, in that

Goldberg's unjust-enrichment claim aims to recover the same payments (tuition and fees) as his

contract-breach claim and is based on the same allegedly breaching conduct (Pace's failure to provide Goldberg with an in-person education, the Rep-Season, and the Process Lab).  *See Columbia*, 2021 WL 790638, at *9 (holding Pace students' unjust-enrichment claims "easily dismissed, as the claims rest on the same factual allegations as their contract claims"); *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 791 (2012) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim.").

Second, the SAC does not plead facts indicating that the cessation of in-person education in the face of the pandemic "would lead to inequity," *see Hassan*, 2021 WL 293255 at *11, or to Pace's unjust enrichment, *see Clark*, 300 A.D.2d at 733 (dismissing unjust enrichment claim where facts supported only a "purely incidental" benefit to defendant).  On the contrary, on the facts alleged, there were compelling—indeed, compulsory—reasons for Pace's abrupt move to online learning.  The SAC alleges that, thereafter, Pace continued to furnish Goldberg with an education, that Goldberg was able to earn credits and graduate on time, and that Pace has committed to furnishing Goldberg, once it is again possible, the Rep-Season and Process Lab offerings that became untenable in March 2020.  On the facts pled, this is not close to a case in which "equity and good conscience" require restitution.

### D.    Promissory Estoppel

To establish a promissory-estoppel claim, the plaintiff must establish: (1) the defendant's "clear and unambiguous promise," (2) upon which the plaintiff reasonably relied, (3) to her detriment.  *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 202 (2d Cir. 2019).  Like unjust enrichment, promissory estoppel is a quasi-contractual claim that is precluded in the absence of "a legal duty independent of the contract."  *Nungesser*, 169 F. Supp. 3d at 374 (quoting *O'Grady v. BlueCrest Cap. Mgmt. LLP*, 111 F. Supp. 3d 494, 504 (S.D.N.Y. June 15, 2015)).  However, "[p]laintiffs who allege the existence of a valid contract may nonetheless plead the alternative

25

theor[y] of promissory estoppel . . . when the defendant does not concede the enforceability of such contract."  *See, e.g.*, *Personal Watercraft Prod. SARL v. Robinson*, 2017 WL 4329790, at *11 (S.D.N.Y. Sept. 1, 2017) (collecting cases).

The SAC, in pleading promissory estoppel, alleges that Pace promised Goldberg that it would offer in-person instruction, the Rep-Season, and its accompanying Process Lab course as part of his three-year course of study.  The SAC claims it was reasonable and foreseeable that Goldberg would rely on these promises in deciding to attend Pace's Actors Studio program.  In moving to dismiss, Pace argues that the SAC does not plead any of the required three elements.  *See* Mem. at 20.  First, it disputes that it unambiguously promised to conduct in-person classes or not to reschedule the Rep-Season and Process Lab.  *Id.* at 21. Second, it argues that even if there were enforceable promises of in-person learning, Goldberg cannot show reasonable and foreseeable reliance because Pace's policies specifically reserved the right to change class assignments and schedules in the event of unforeseen circumstances and that doing so would not entitle Goldberg to a refund.  *Id.* at 21.  Third, Pace argues, Goldberg was not injured, as he received instruction, class credit, and graduated with a diploma, and will, following the pandemic, be offered a Rep-Season opportunity (and the accompanying Process Lab preparatory course).  *Id.* at 21–22.

The Court dismisses Goldberg's promissory-estoppel claims for multiple reasons.  First, they are duplicative of his contract claim, turning on identical facts and alleged promises and policies.  *See Nungesser*, 169 F. Supp. 3d at 374 (promissory estoppel claim precluded where it relied on the "exact same policies at issue" in contract claim).  They therefore must be dismissed as redundant.  *See id.*  In any event, the SAC fails to allege the required elements.  Contrary to Goldberg's claim, his implied contract with Pace did not include a specific promise of in-person

education.  *See Ward*, 2000 WL 1448641, at *6 (dismissing claim for promissory estoppel where no specific promise or representation was identified in university's general policies).

     To the extent this claim relates to the deferred Rep-Season and Process Lab offerings, it fails for similar reasons.  Pace, as noted, did not specifically promise that these would be held at a particular time, and, on the pleadings, has advised Goldberg of its intent to reschedule them once possible.  The SAC accordingly does not plausibly plead a breach of a clear and unambiguous promise by Pace or reasonable reliance by Goldberg.  And, as with the contract claim, any claim along these lines—including as to the element of detrimental reliance—is unripe for adjudication, pending Pace's promised future offer to Goldberg of a successor Rep-Season and Process Lab.

> ### E.    New York General Business Law § 349

To state a claim under N.Y. GBL § 349, a plaintiff must allege: "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012).  Deceptive acts are those "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003) (citation omitted). The plaintiff must demonstrate that the "reasonable consumer would have been misled by the defendant's conduct."  *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 570 (E.D.N.Y. 2010). "The statute has been held to apply to educational contracts."  *Deen*, 2007 WL 1032295, at *5.

     Here, the SAC alleges that moving classes online and postponing the Process Lab and Rep-Season were "unlawful, unfair, and fraudulent" business practices because the result was that Goldberg paid for services that he did not receive in the form expected.  SAC ¶ 161.  It further accuses Pace of misleading Goldberg in a material way when it sought tuition while reserving the right to pivot to remote learning and postponing the Process Lab and Rep-Season.

*Id.* ¶ 162.  Pace counters that Goldberg has not pled any premeditated act to mislead or "trick" Goldberg for Pace's benefit.  Mem. at 24.

The SAC does not come close to alleging deceptive or materially misleading conduct on Pace's part.  There is no coherent allegation that Pace acted in any such improper way before the pandemic.  And even drawing all reasonable inferences in Goldberg's favor, there is nothing about the facts pled as to Pace's response to the public-health crisis and executive orders prohibiting on-campus instruction, *i.e.*, the transition to remote learning, that makes them deceptive or misleading within the meaning of N.Y. GBL § 349.  *See Columbia*, 2021 WL 790638, at *10 (dismissing similar claim because plaintiffs did not allege the universities' representations of their services were materially misleading and the universities could not have predicted "that a pandemic would necessitate fundamental changes to its services and operations"); *Bergeron*, 2020 WL 7486682, at *11 (finding that university's publications would not lead a reasonable prospective student to believe the institution would risk student safety); *see Ford*, 2020 WL 7389155, at *10 ("No reasonable consumer would expect a university to remain open for in-class instruction in the face of a pandemic and a state-mandated shutdown, regardless of whether the school advertised on-campus learning as a strength.").  As a matter of policy, Goldberg may take issue with Pace's decision not to offer him tuition or fee refunds, whether in connection with the move to remote learning or the deferral of the Process Lab and Rep-Season.  But the facts pled do not, at all, make out a deceptive business practice.  The Court therefore dismisses Goldberg's claim under N.Y. GBL § 349.

## CONCLUSION

For the foregoing reasons, the Court denies in part and grants in part Pace's motion for judgment on the pleadings.  The Court denies Pace's motion as to Goldberg's breach-of-contract claim based on Pace's mandatory fees.  The Court, however, otherwise grants Pace's motion, and

dismisses Goldberg's remaining claims.  These dismissals are with prejudice, with the exception of Goldberg's breach-of-contract claims based on the Rep-Season and the Process Lab, which are dismissed without prejudice to Goldberg's right to bring future such claims upon a ripe showing of breach.  The Clerk of Court is respectfully directed to terminate the motions pending at dockets 21 and 25.

A conference is hereby scheduled for May 14, 2021 at 3 p.m. This conference will be held telephonically. The parties should call into the Court's dedicated conference line at (888) 363-4749, and enter Access Code 468-4906, followed by the pound (#) key. Counsel are directed to review the Court's Emergency Individual Rules and Practices in Light of COVID-19, found at https://nysd.uscourts.gov/hon-paul-engelmayer, for the Court's procedures for telephonic conferences and for instructions for communicating with chambers.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: April 21, 2021
       New York, New York