USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Jan 31 2024

# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2023

(Argued: May 19, 2022  Decided: December 8, 2023)

Docket No. 21-1377

BRETT GOLDBERG,

*Plaintiff-Appellant*,

–v.–

PACE UNIVERSITY,

*Defendant-Appellee*.

B e f o r e :

RAGGI, CARNEY, and NATHAN, *Circuit Judges*.

Plaintiff-Appellant Brett Goldberg appeals from the judgment of the United States District Court for the Southern District of New York (Engelmayer, *J.*) granting Defendant-Appellee Pace University's motion for judgment on the pleadings. *Goldberg v. Pace Univ.*, 535 F. Supp. 3d 180 (S.D.N.Y. 2021). Goldberg was a graduate student in the performing arts at Pace University in the spring of 2020. His education was interrupted by the COVID-19 pandemic. After Pace, in response to the pandemic and related governmental orders, elected to move several of Goldberg's classes online and to postpone both the performance of Goldberg's play and a class designed to prepare

for that performance, Goldberg sued Pace for breach of contract, unjust enrichment, promissory estoppel, and violation of New York General Business Law § 349. The district court granted Pace's motion for judgment on the pleadings and (with one exception no longer at issue) dismissed Goldberg's claims. The court reasoned that, in light of the published Emergency Closings provision that applied to Pace's relationship with its graduate students, Goldberg did not sufficiently allege a breach as to the postponement of his play and class. The court further determined that Goldberg failed to identify a sufficiently specific promise under New York law of in-person instruction; that his unjust enrichment and promissory estoppel claims were impermissibly duplicative of his breach of contract claims; and that his § 349 claim failed for similar reasons. On review, we AFFIRM the judgment of the district court, concluding primarily that Pace's postponement and move to an online format were permitted by the Emergency Closings provision.

AFFIRMED.

---

MORRIS E. COHEN (Lee A. Goldberg, *on the brief*), Goldberg Cohen LLP, New York, NY *for Brett Goldberg*.

JOHNATHAN B. FELLOWS (Suzanne M. Messer, *on the brief*), Bond, Schoeneck & King, PLLC, Syracuse, NY *for Pace University*.

---

CARNEY, *Circuit Judge*:

Brett Goldberg sued Pace University for breach of contract, unjust enrichment, promissory estoppel, and violation of New York General Business Law § 349 after the onset of the COVID-19 pandemic caused Pace to postpone certain aspects of Goldberg's master's degree program in the performing arts and to move other aspects online during the spring 2020 semester. On Pace's motion for judgment on the pleadings, the district court dismissed Goldberg's complaint as to all but an ancillary claim for fees that is no longer at issue. *Goldberg v. Pace Univ.*, 535 F. Supp. 3d 180 (S.D.N.Y. 2021) (Engelmayer, *J.*).

2

The court concluded that Goldberg's claims were not ripe as to the program's postponed components for two reasons: first, an explicit provision in Pace's graduate course catalog, the Emergency Closings provision, incorporated into Goldberg's complaint by reference, entitled Pace in its discretion to reschedule courses and assignments in the event of unforeseen circumstances beyond the University's control; second, the complaint showed that Pace planned to conduct the postponed components after pandemic-related restraints were relaxed.

It also determined that Goldberg failed to state a claim as to Pace's transition of some of Goldberg's classes to an online format in the remaining weeks of the spring 2020 semester. It reasoned that Goldberg did not identify any sufficiently specific promise by Pace to provide only in-person instruction and that such a promise was required by New York law to sustain a student's breach of contract claim against a university. The district court further ruled that Goldberg's unjust enrichment and promissory estoppel claims failed both on the merits and because they were impermissibly duplicative of his breach of contract claims, and that his § 349 claims were wanting because "the facts pled do not, at all, make out a deceptive business practice." *Id.* at 201.[1]

On *de novo* review, we conclude that the Emergency Closings provision set forth in Pace's Graduate School Course Catalog permitted Pace to delay some aspects of Goldberg's program, making Goldberg's postponement-related claims not ripe. We also decide that the Emergency Closings provision allowed Pace to move four of Goldberg's courses online from March through May; accordingly, we do not reach the question whether Goldberg sufficiently alleged a specific promise of in-person instruction as to

---

[1] The district court rejected, however, one ground for dismissal advanced by Pace: that the complaint alleged non-cognizable educational malpractice claims. 535 F. Supp. 3d at 191–92. That ruling is not before us on appeal. Pace Br. at 10 n.3.

3

those courses. We further agree with the district court that Goldberg's unjust enrichment and promissory estoppel claims warranted dismissal because they were impermissibly duplicative of his breach of contract claim. And, on appeal, Goldberg does not challenge the dismissal of his § 349 claim and has disclaimed any intent to pursue his ancillary claim for fees. Accordingly, we affirm the district court's award to Pace of judgment on the pleadings.

## BACKGROUND[2]

A. The Actors Studio MFA Program

In 2017, Brett Goldberg enrolled in Pace's Master of Fine Arts (MFA) program, also known as the Actors Studio Drama School, or "Actors Studio." The Actors Studio is a three-year graduate degree program for aspiring actors, directors, and playwrights. An important part of the program is the Repertory Season, or "Rep Season," during which students work together to produce a professional grade play and to stage it for "representatives from the theater, film, and television industries." Second Amended Complaint ("Complaint") ¶ 2. Pace's marketing materials described the Rep Season as

---

[2] We draw this factual statement primarily from the allegations of Goldberg's Second Amended Complaint (the "Complaint") and the Exhibits attached to it, accepting all factual allegations as true and drawing all reasonable inferences in Goldberg's favor, as we must on review of the grant of a motion for judgment on the pleadings. *D'Addario v. D'Addario*, 75 F.4th 86, 92 (2d Cir. 2023). We also refer to documents that the Complaint incorporates by reference, including the full text of Pace's 2019–20 Graduate School Course Catalog ("Graduate Catalog"). *See* Compl. ¶ 113 ("The terms of the contract include the provisions set forth in the University's catalog for Plaintiff's graduate program, which is posted online. *See, e.g.*, Exhibit 8"); *id.* ¶ 122 (referencing Emergency Closings provision in the Graduate Catalog); App'x at 59–75 (excerpting the Graduate Catalog as an exhibit to the Second Amended Complaint); *id.* at 218 (attaching Emergency Closings provision as exhibit to Pace's Answer to Goldberg's Second Amended Complaint); *see also Goldberg*, 535 F. Supp. 3d at 185 n.1.

4

the "culmination" of students' time in the Actors Studio and as their "introduction to the professional theater world." *Id.* ¶ 6.

Pace's public marketing materials also highlighted other aspects of the Actors Studio program. For example, its informational webpage about the Actors Studio stated that all of its students "train side-by-side as actors," that the school's "black-box studios for professional training are designed and equipped according to state-of-the-art standards," and that its location in New York City gave Actors Studio students "incomparable resources for the development of their art and the launching of their careers." *Id.* ¶ 27.[3] Although Pace also offered certain graduate programs that were fully online, its materials did not identify the Actors Studio as an online program, and tuition for the Actors Studio was significantly more expensive than Pace's online offerings. *Id.* ¶¶ 25–26.

Along with its program-related text, Pace's 2019–20 Graduate Catalog addressed "Emergency Closings and Other Changes in Class Schedules." It stated in relevant part:

> Occasionally, the University is confronted by the need to close because of inclement weather or other reasons beyond the University's control . . . . Although classes are planned to commence and conclude on the dates indicated in the academic calendar, unforeseen circumstances may necessitate adjustment to class schedules and extension of time for completion of class assignments. Examples of such circumstances may include faculty illness, malfunction of University equipment (including computers), unavailability of particular University facilities occasioned by damage to the premises, repairs or other causes, and school closings because of inclement weather. The University shall

---

[3] The Complaint cited material then available at *About Us*, Pace Univ., https://www.pace.edu/dyson/departments/actors-studio-drama-school/unique-aspects-actors-studio-drama-school [https://perma.cc/58VZ-4GCY].

5

> not be responsible for the refund of any tuition or fees in the event of any such occurrence.

App'x at 218 (the "Emergency Closings provision").

Goldberg is an aspiring playwright. In his third year of the Actors Studio program, which was scheduled to end on May 16, 2020, he collaborated with his classmates to stage one of his own plays. The production was to take place during the Spring 2020 Rep Season. As part of the project of staging his play, Goldberg and his classmates were required to take a class called the Process Lab, during which they would collaborate on production particulars. Goldberg was also enrolled in four other classes: "Voice and Speech 3.2," "Improvisational Movement 6," "Playwriting 6," and "Film and TV Writing Workshop II." App'x at 226.[4]

During the first six weeks of the spring 2020 semester, which began on January 27, 2020, these classes were held in person, as had been Goldberg's previous five semesters of Actors Studio classes. Pace's policies required in-person attendance; students were advised that failure to attend could affect their grades. Compl. ¶ 20.

B. Pandemic-related Disruptions

As the world well knows, the COVID-19 pandemic reached New York City in early 2020. Starting on March 7, Governor Andrew Cuomo declared a state of emergency and began issuing orders restricting public activities. *See Rynasko v. New*

---

[4] The Complaint referred to these classes collectively, without listing their titles. Goldberg claims, however, that "[i]n the context of the unique benefits in Plaintiff's program of study, the online classes are not equivalent or comparable to the promised classes that were to be provided in-person. Compl. ¶ 81. A copy of Goldberg's final transcript is attached to Pace's Answer to Goldberg's Second Amended Complaint, App'x at 226–27, the class list is referred to by the parties in their briefs on appeal, Goldberg Supp. Br. at 1 n.1; Pace Br. at 7, and Goldberg has not contested the authenticity or accuracy of his transcript. We therefore consider it to be incorporated by reference into his complaint. *See Flatscher v. Manhattan Sch. of Music*, 551 F. Supp. 3d 273, 280 n.7 (S.D.N.Y. 2021) (considering transcript attached to Defendant's Answer to be incorporated by reference in a suit challenging school's transition to online learning).

6

*York Univ.*, 63 F.4th 186, 191 & n.4 (2d Cir. 2023) (taking judicial notice of New York executive orders). By email dated March 10, Pace advised students that it had decided—effective March 11 and subject to further updates—to suspend in-person class meetings through March 29, "to keep everyone in [its] community healthy." *See id.* ¶ 80 n.7.[5]

Pace determined that the Rep Season could neither go forward as scheduled nor transition effectively to an online format. Instead, on March 12, Pace put the Rep Season "on hold," aiming to "re-boot" and resume production on either March 30 (Plan A) or August 31, 2020 (Plan B), depending on how the pandemic developed. App'x at 52–53. Pace also postponed the remaining five sessions of the Process Lab and stated its intention to "more than ma[k]e up for" those sessions once preparation for the "future Rep Season" resumed. *Id.* at 51.

On March 18, as it became clear that the pandemic was not going to abate in a matter of weeks, Pace advised students that it had decided to continue online instruction of classes through the rest of the spring semester and that it had postponed Commencement. Compl. ¶ 82.[6] *See also* App'x 213 (Executive Order [A. Cuomo] No. 202.6, 9 NYCRR § 8.202.6 (Mar. 18, 2020)).

C.     Procedural History

Goldberg filed suit on May 13, 2020, alleging that Pace breached its contract with him by refusing to refund the tuition he had paid for the Actors Studio program. Compl. ¶ 44. He sought either a full refund of the $90,000 he had paid in tuition and fees over the course of his two and one-half years to date in the Actors Studio program,

---

[5] *See* Email from Marvin Krislov, President, Pace Univ., to Pace Community (Mar. 10, 2020) [https://perma.cc/SWJ5-HDLQ].

[6] *See* Email from Marvin Krislov, President, Pace Univ., to Pace Community (Mar. 18, 2020) [https://perma.cc/85YU-2HYD].

7

or an unspecified *pro rata* reimbursement of his tuition, along with compensation for "the value of the Rep-Season." *Id.* ¶ 11; *see id.* ¶¶ 50–52, 79. In the alternative to his breach of contract claims, he brought claims for unjust enrichment, promissory estoppel, and for "deceptive business practices" in violation of New York General Business Law § 349. *See id.* ¶ 11.

After Goldberg twice amended his complaint and Pace answered, Pace moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The district court denied Pace's motion as to Goldberg's claim for refund of certain non-tuition fees,[7] but granted Pace's motion as to all other claims.

Goldberg timely appealed. We held decision on the appeal pending this Court's determination of an earlier case that raised similar New York law questions regarding alleged breaches of student-university contracts arising from the pandemic. *See Rynasko*, 63 F.4th 186, *rehearing en banc denied* (Jul. 31, 2023), ECF No. 154.

## DISCUSSION

We review *de novo* a district court's grant of a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *L-7 Designs, Inc. v. Old Navy*,

---

[7] In May 2021, Goldberg stipulated to and the district court so-ordered the voluntary dismissal, without prejudice, of Goldberg's ancillary fees-related claim. Stipulation & Order of Dismissal, *Goldberg v. Pace University*, 1:20-cv-03665-PAE (S.D.N.Y. May 11, 2021), Dkt. 44. In November 2023, we issued an Order to Show Cause why, in light of the without-prejudice dismissal of that claim, this Court did not lack jurisdiction to hear Goldberg's appeal. *See Rabbi Jacob Joseph Sch. v. Province of Mendoza*, 425 F.3d 207, 210–11 (2d Cir. 2005). Goldberg then submitted a statement of his binding intention to abandon that claim. *Goldberg v. Pace University*, 21-1377 (2d Cir. Nov. 17, 2023), Dkt. 70. This statement transformed the district court order into a dismissal with prejudice as to all of Goldberg's claims and cleared the way for our exercise of appellate jurisdiction. *See, e.g.*, *Alix v. McKinsey & Co.*, 23 F.4th 196, 203 (2d Cir. 2022); *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 255 (2d Cir. 2015); *Jewish People for the Betterment of Westhampton Beach v. Vill. of Westhampton Beach*, 778 F.3d 390, 394 (2d Cir. 2015).

8

*LLC*, 647 F.3d 419, 422 (2d Cir. 2011). "To survive a motion for judgment on the pleadings, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face,'" *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), the same standard that governs a Rule 12(b)(6) motion to dismiss, *id.*

In assessing a Rule 12(c) motion, the court "may consider all documents that qualify as part of the non-movant's 'pleading,' including (1) the complaint *or* answer, (2) documents attached to the pleading, (3) documents incorporated by reference in or integral to the pleading, and (4) matters of which the court may take judicial notice." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 306 (2d Cir. 2021) (emphasis in original).

I. **The Emergency Closings provision entitled Pace to postpone the Rep Season and Process Lab and to move Goldberg's other classes online.**

Under New York law, a student and the college or university in which the student enrolls enter into an implied contract, the essence of which is that the "academic institution must act in good faith in its dealings with [the] student[]." *Matter of Olsson v. Bd. of Higher Educ.*, 49 N.Y.2d 408, 414 (1980); *see Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011). The precise terms of the implied contract are established by "the university's bulletins, circulars and regulations made available to the student." *Papelino*, 633 F.3d at 93 (quoting *Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881 (2d Dep't 1987)).

To state a valid claim for breach of contract in that unique context, the student must first identify an express promise for "certain specified services" in the university's relevant materials. *Baldridge v. State*, 740 N.Y.S.2d 723, 725 (3d Dep't 2002) (quoting *Paladino v. Adelphi Univ.*, 454 N.Y.S.2d 868, 873 (2d Dep't 1982)). He then "must state when and how the defendant breached [that] specific contractual promise." *In re*

9

*Columbia Tuition Refund Action*, 523 F. Supp. 3d 414, 421 (S.D.N.Y. 2021) (internal quotation marks omitted). "[W]ithout the identification of a specific breached promise or obligation," the claims of a "disgruntled student" do not suffice to state a claim on which relief can be granted. *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998). The New York Court of Appeals has explained in this regard that "[c]ontract theory is not wholly satisfactory . . . because the essentially fictional nature of the contract results in its generally being assumed rather than proved, because of the difficulty of its application, and because it forecloses inquiry into, and a balancing of, the countervailing interests of the student on the one hand and the institution on the other." *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 658 (1980).

Universities may limit or qualify their promises by including a *force majeure* provision in their implied contracts with students, but, as we recently held, such a clause must be narrow to be enforceable. *See Rynasko*, 63 F.4th 186. In *Rynasko*, this Court vacated a district court's dismissal of a pandemic-related breach of contract case against New York University ("NYU"), holding in part that the disclaimer language in NYU's course catalog did not defeat the plaintiffs' claim. 63 F.4th at 199. In that case, the disclaimer was broad and general, allowing NYU to "change without notice *at any time* its course offerings, including, but not limited to . . . the relocation of or modification of the content of any of the foregoing; and the cancellation of scheduled classes or other academic activities." *Id*. (internal quotation marks omitted) (emphasis added). NYU's disclaimer provision, we found, was expansive enough to encompass a transition to remote learning even without a particular predicate: this would be a level of unilateral power too "unfettered" and one-sided to be equitably enforced by a court. *Id.* at 200 (quoting *Shaffer v. George Washington Univ.*, 27 F.4th 754, 765 (D.C. Cir. 2022)). As we observed there, "Language in contracts placing one party at the mercy of the other is

10

not favored by the courts." *Id.* (quoting *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 438 (1994)).

In *Rynasko*, we distinguished NYU's sweeping disclaimer from a more traditional, and enforceable, *force majeure* clause. We defined such a clause as a "'contractual provision allocating the risk of loss if performance becomes impossible or impracticable, especially as a result of an event or effect that the parties could not have anticipated or controlled.'" *Id.* at 200 n.16 (quoting *Force-Majeure Clause*, Black's Law Dictionary (11th ed. 2019) (alterations adopted)).

Pace's Emergency Closings provision falls squarely within this definition. It allocated the risk of loss to students in the event that Pace "need[ed] to close" due to an "unforeseen," "emergency" circumstance, one that is "outside of the [Pace's] control." App'x at 218. The provision did not confer upon Pace "unfettered" power to "completely shut down its on-campus, in-person operations" and to transition to online instruction absent some unforeseen event. *Rynasko*, 63 F.4th at 200 (internal quotation marks omitted). Nor did it give Pace the power to transition to online learning in order to "jump at an opportunity to rent the campus out to Amazon," as Goldberg unreasonably hypothesizes. Goldberg Supp. Br. at 4–5.

In light of this provision, Pace was within its contractual rights to postpone the Rep Season and Process Lab and to move Goldberg's other classes online on account of the pandemic, and Goldberg's complaint failed to plausibly allege a breach of contract as to either action. As discussed below, Goldberg resists this conclusion, but we find his arguments unpersuasive.

  A. <u>The Emergency Closings provision applied to the unforeseen circumstance, beyond Pace's control, of COVID-19.</u>

Goldberg first argues that, to cover the actions Pace took in response to COVID-19, the Emergency Closings provision had to list "pandemic" as a trigger. He points to

11

our decision in *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118 (2d Cir. 2022), as supporting his position.

Goldberg is correct that *JN Contemporary Art* emphasizes the New York law requirement that courts narrowly construe *force majeure* clauses. *Id.* at 124 (citing *Kel Kim Corp. v. Cent. Mkts., Inc.*, 70 N.Y.2d 900, 902–03 (1987)). But in that case we also applied the New York law principle that courts should avoid interpretations that would render contractual provisions superfluous, concluding that the catchall clause of a *force majeure* provision would become superfluous if we interpreted the provision to apply only to listed events. *Id.* (citing *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. (1992)). Instead, we applied the principle of *ejusdem generis* to the catchall, construing it to be limited to events that were similar to the events listed before it. *Id.* at 124–25 (citing *Kel Kim*, 70 N.Y.2d at 903 and *Team Mktg. USA Corp. v. Power Pact, LLC*, 839 N.Y.S.2d 242, 246 (3d Dep't 2007)). Doing so, we held that "the COVID-19 pandemic and the orders issued by New York's governor" fell under a catchall clause's protection for "circumstances beyond our or your reasonable control," even though the larger *force majeure* provision omitted any specific mention of pandemics. *Id.* at 121, 124 (internal quotation marks omitted). The decision thus provides Goldberg no meaningful support.

Instead, our Court's reasoning in *JN Contemporary Art* and the principle of *ejusdem generis* support Pace's argument that the pandemic falls under the Emergency Closings provision's catchall protection for "unforeseen circumstances" "beyond the University's control." App'x at 218. Pace's Emergency Closings provision stated that it applied, "for example," to "faculty illness, malfunction of University equipment (including computers), unavailability of particular University facilities occasioned by damage to the premises, repairs or other causes, and school closings because of inclement weather." *Id*. As in *JN Contemporary Art*, the COVID-19 pandemic is similar to "the sort of events that fall within [Pace's] force majeure clause." 29 F.4th at 125. To

12

start, although some of the listed terms in the Emergency Closings provision contemplate relatively short-term disruptions like a computer crash or a snowstorm, others envision long-term problems, such as those caused by damage to university buildings or a building's "unavailability" due to "other causes." App'x at 218. Moreover, like pandemics, unforeseen disruptions such as damaged facilities, faculty illness, and inclement weather raise safety concerns that may warrant adjusting class schedules. And although Goldberg characterizes "faculty illness" as encompassing only "the flu," Goldberg Supp. Br. at 14, we see no reason that the term shouldn't be read to apply equally to other diseases, such as cancer, or—although not anticipated by Pace when it drafted the provision—to the risk of a serious global illness like COVID-19.

    B.    <u>The Emergency Closings provision covered the postponement of the Process Lab and Rep Season.</u>

    1.    Goldberg first takes the position that because the Rep Season was ungraded and not taken for credit, it was not a "class[]" of the sort covered by the Emergency Closings provision. Goldberg Br. at 45–48.[8] This premise strikes us as implausible in light of Goldberg's own descriptions of the Rep Season as a core part of the educational program in which he enrolled.

Even accepting the premise, however, the Emergency Closings provision by its terms was not limited to classes. It provided that "unforeseen circumstances may necessitate adjustment to class schedules and extension of time for completion of *class assignments*," as well. App'x at 218 (emphasis added).

---

[8] Goldberg does not appear to extend his argument to the Process Lab, which was plainly a "class[]" covered by the Emergency Closings provision. *See* App'x at 218 ("unforeseen circumstances may necessitate adjustment to class schedules"); *see also* Compl. ¶ 41 (referring to the Process Lab as a class); Goldberg Br. at 45 (omitting mention of the Process Lab in section titled "The Rep-Season is not a 'Class'").

13

By Goldberg's own description, the Rep Season was, at minimum, a class assignment. The Complaint described the Rep Season as the "cornerstone of the playwriting curriculum" at the Actors Studio and the "selling point of the playwriting track for [its] students, including [Goldberg]." Compl. ¶ 32. It explained that the "first year playwriting class" is where "the play for the Rep-Season is chosen," and that this "is followed by other playwriting classes," including "the 'Playwright Directors Unit' . . . where the Rep-Season plays are workshopped the entire second year in an effort to prepare them for the production the following year." *Id.*; *see also id.* ¶ 117 ("From the first year of the program, playwriting students created and developed their Rep-Season plays through specific classes[.]"). In the third year, the Process Lab classes are "where the play is further developed and honed for the end of the year," and the "third year 'Playwriting' class also focuses on fine tuning the plays for the Rep-Season." *Id.* ¶ 32. Along these lines, a Process Lab course description Goldberg attached as an exhibit to the Complaint explained that "Process Lab prepares the Thesis Projects for their presentation in the 2020 Repertory Season." App'x at 54; *see* Goldberg Br. at 34 (describing the Rep Season as his "version of a thesis"); *see also* App'x at 90 (Actors Studio Drama School brochure, attached as exhibit to Complaint, describing "Third-year Repertory Season" as "fully professional productions of the work [students] *created during their study*" (emphasis added)).

2. Goldberg further contests the district court's characterization of his Rep Season and Process Lab claims as unripe. To be ripe for adjudication, a claim must present a "real, substantial controversy, not a mere hypothetical question." *Longway v. Jefferson Cnty. Bd. of Supervisors*, 24 F.3d 397, 400 (2d Cir. 1994) (internal quotation marks omitted); *see also Texas v. United States*, 523 U.S. 296, 300 (1998). A breach of contract claim becomes ripe under New York law "immediately upon the breach." *Emigrant Bank v. SunTrust Bank*, 20-cv-2391, 2023 WL 2647648, at *20 (S.D.N.Y. Mar. 27, 2023)

14

(internal quotation marks omitted); *see also Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y. 2d 399, 402 (1993).

As the district court found, Goldberg's complaint plausibly alleged that Pace promised Goldberg an "opportunity to participate in the Rep Season program." *Goldberg*, 535 F. Supp. 3d at 196. The district court also correctly determined, however, that the complaint failed to allege that Pace had yet definitively denied him that opportunity. Documents—largely emails from the Pace administration to students—that Goldberg attached to his complaint stated Pace's intention to "re-boot" the Rep Season and to "more than ma[k]e up for" the Process Lab classes when the Rep Season was held. App'x at 50–53. In other words, the Complaint showed that Pace was exercising its discretion—in accordance with the Emergency Closings provision—to postpone the Rep Season and Process Lab temporarily in the face of "unforeseen circumstances" that were "beyond [Pace's] control." App'x at 218.

Accordingly, Goldberg merely alleged that Pace *might* breach its contract by deciding not to offer the rescheduled Rep Season once the "unforeseen circumstances" of the pandemic abated. *Id.* Such a situation remained "hypothetical" when the district court was reviewing Goldberg's complaint. The district court thus properly dismissed the relevant breach of contract claims as unripe. *See Longway*, 24 F.3d at 400.[9]

---

[9] In their briefs on appeal, both Goldberg and Pace assert that Pace did reschedule the Rep Season, and that in October 2021 Goldberg's play was staged four times. Pace Br. at 3; Goldberg Reply Br. at 22. Goldberg also asserts in his brief that the Process Lab did not take place alongside the rescheduled Rep Season and that some aspects of the October 2021 Rep Season were inadequate. Goldberg Reply Br. at 22–23. Goldberg is free to commence a new action based on these allegations. We will not, however, expand the record to consider these assertions here.

15

C. The Emergency Closings provision applied to Pace's decision to move Goldberg's other classes online during spring 2020.[10]

Goldberg also argues that Pace breached its contract with him by moving four classes—"Voice and Speech 3.2," "Improvisational Movement 6," "Playwriting 6," and "Film and TV Writing Workshop II"— to an online format for approximately six weeks, from March 10 to early May. We are not convinced.

As explained above, the Emergency Closings provision expressly entitled Pace to make "adjustment[s] to class schedules and extension[s] of time for completion of class assignments" in the face of "unforeseen circumstances" that were "beyond the University's control." App'x at 218. Goldberg's spring 2020 courses were "class[es]" covered by the provision, *see id.*, and Pace's decision to move these classes online constituted a covered "adjustment" to Goldberg's schedule. One able district judge has found the same language "ambiguous" as to whether it applied to Pace's decision to move to an online format in the face of the pandemic. *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d at 425. It appears to us, however, that the Emergency provision can be read only one way: as protecting Pace's decision to convert its classes to an online format rather than to abandon its instructional mission altogether. We cannot

---

[10] Goldberg argues that Pace waived its argument that the Emergency Closings provision protects its transition to online learning because Pace argued in its brief on appeal only that the provision applied to its Rep Season postponement. Goldberg Supp. Br. at 12–13. But where an "argument presents a question of law and there is no need for additional fact-finding," we have discretion to review it, even if it was not timely raised. *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 232–33 n.25 (2d Cir. 2023) (internal quotation marks omitted). Pace's Emergency Closings argument presents a legal question, requires no additional factfinding to determine whether the provision applies to Pace's transition to online learning, and Goldberg has had an adequate opportunity to respond to the argument. Goldberg's own briefing also tends to merge discussion of his two claims of breach. Accordingly, we exercise our discretion to reach this question.

16

conclude otherwise in light of Pace's express reservation of rights to make adjustments in response to unforeseen and uncontrollable circumstances.

## II. The district court properly dismissed Goldberg's unjust enrichment and promissory estoppel claims.

In New York, claims in quasi-contract such as unjust enrichment and promissory estoppel are ordinarily precluded if a "valid and enforceable written contract," even an implied contract, "govern[s]" the relevant "subject matter." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (internal quotation marks omitted). And while it is true that a plaintiff may plead unjust enrichment and promissory estoppel claims in the alternative if there is "a dispute over the existence, scope, or enforceability of the putative contract," *Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d 253, 263 (2d Cir. 1999), there is no such dispute here.

Goldberg argues that the existence of a contract was disputed here because, in its Answer to the Complaint, Pace "questioned the existence" of an implied contract. Goldberg Br. at 54 (citing App'x at 25, 201). But Pace "does not dispute" on appeal that under New York law some form of implied contract exists between it and Goldberg, and that that implied contract governs its obligations to Goldberg regarding the format of his class instruction and the holding of the Rep Season. Pace Br. at 16. Rather, Pace focuses on the terms of that implied contract, contending that "a promise of 'in-person instruction' [is] not one" of those terms. *Id.*

The portion of Pace's answer that Goldberg cites is not to the contrary. There, Pace denied the existence of such a contract "*except* . . . that to the extent a contract exists it provided, in part, that [Goldberg] would be 'bound by the policies, practices, and procedures of Pace University, whether published or unpublished, and [he] would agree to comply with them.'" App'x at 201 (emphasis added). Accordingly, Goldberg's

17

quasi-contractual claims were entirely duplicative of his breach of contract claims, and the district court properly dismissed them.

## CONCLUSION

We have considered Goldberg's remaining arguments and find in them no basis for reversal. The order of the district court is **AFFIRMED**.

18